# EXHIBIT A



1400 Sixteenth Street
Market Square, Suite 400
Denver, CO 80202
720-932-8060 [Main]
www.alliancemgmt.com

# CRO Agreement

**Client: Ajubeo, LLC**                                                                 **Client File:**

This Agreement, dated and entered into this 25th day of August 2017, by and between **Ajubeo, LLC** (hereinafter **"Client"**), 1470 Walnut Street, Suite 400, Boulder, CO, 80302, and BGA Management, LLC d/b/a **Alliance Management** (hereinafter "**Alliance**" or "**Consultant**"), Carlson Towers, Suite 110, 601 Carlson Parkway, Minnetonka, MN  55305, which sets forth the terms and conditions of the business relationship of the parties hereto.

## 1.  Consulting Assignment
**1.1     Scope**.  Client is seeking to have Consultant serve in the capacity of *Chief Restructuring Officer ("CRO")*.  The CRO shall have the authority of a senior manager of client's business, subject to the direction of the Board of Directors, to take such action on behalf of Client as the CRO, in its business judgment, deems necessary, appropriate and in the best interests of Client, including, without limitation, authority to:

(a)     manage and control all disbursements and all purchases of goods and services;

(b)     retain and supervise attorneys and other professionals to represent Client and assist in conducting and effectuating the Sale Process;

(c)     to administer and execute the Sale Process and to execute and deliver all agreements, instruments and other documents, and take such other actions as the CRO considers necessary or advisable to effectuate the Sale Process and carry out the purposes thereof;

(d)     represent Client in discussions, negotiations and agreements with Lender, other creditors, stakeholders and constituencies of Client, and manage the relationships with, and communications to and from, such Persons, including, without limitation, with respect to modification, settlement or other restructuring issues, including credit, loan and forbearance agreements and extensions and other modifications to such agreements;

(e)     oversee Client's cash financial functions in order to maintain adequate liquidity to allow execution of the Sale Process; and

(f)     Manage the day-to-day operations of Client's business.

**1.2     Lender Communications.**   Client's Lender shall have the right to contact and have unfettered discussions with the CRO directly without Client's participation in such discussions.
**1.3     Board Oversight.**   It is understood that Consultant shall report to directly to Client's Board of Directors and be subject to the continuing authority, direction and control of the Board.
**1.4     Retention in Court-Supervised Proceeding.**  It is understood that this Agreement is being consummated as part of Client's effort to execute a sale of the business enterprise through Chapter

11 of the US Bankruptcy Code.

## 2. Compensation

**2.1 Professional Fees.** Consultant's work, as set forth in Section 1., above, will be performed and billed by Consultant, and paid for by Client, at the rate of $375 per hour for Brock Kline, $385 per hour for Mark Thomas and David Burke, $395 per hour for Alex Smith and $495 per consulting hour for Michael Knight.  It is anticipated that Alex Smith will perform the majority of the work on this matter, with assistance from other staff members as appropriate.  Client agrees to provide Consultant with retainer deposits in minimum increments of $20,000 for future services requested, with such deposits paid in advance of Alliance providing services.  To ensure a smooth flow of work, Alliance shall remit a new invoice any time the retainer balance is less than $5,000.  Alliance reserves the right to stop services if Client fails to keep a retainer account with Alliance's firm.  Fees left on deposit that remain unearned by Alliance will be promptly returned to Client at the conclusion of the assignment, or upon written request.  Client agrees that the hourly rates quoted in this Section 2.1 are subject to normal and customary increases which occur in January of each calendar year.  Such individuals shall be entitled to the same rights of indemnification as provided officers of Client pursuant to its governance.

**2.2 Incentive Compensation.**  In addition to the Professional Fees set forth in Section 2.1, above, Client agrees to pay Alliance the following success fees:

  **a. Success Fee.**  In conjunction with Alliance's retention as Client's asset sale advisor in a bankruptcy, the following shall apply.  "Asset" shall be defined to mean any asset of the Client of whatever kind or nature, tangible or intangible, real or personal.  If Alliance or professionals selected by Alliance introduce Client to a party or parties who directly or indirectly purchases Asset(s) during the pendency of the bankruptcy proceeding or pursuant to an approved reorganization plan, Alliance "assists" Client in securing a sale of any Assets **(**"assists" means to either (1) communicate with a potential buyer who actually buys Assets and (2) participating directly or indirectly in the negotiation of the transaction**)** whether or not Alliance introduced Client to the party or parties who purchases Assets, then Alliance shall be paid, in addition to any other hourly fees and/or other compensation due hereunder, a fee  at the time of sale of such Assets, and the closing(s) of any such sale(s) shall be contingent upon the payment of such fee.  Such fee shall be two percent (2.0%) of all purchase price consideration paid (whether by one or more buyers) for the Assets sold up to $1,545,000 and five percent (5.0%) of the purchase price consideration paid in excess of $1,545,000.  For purposes of calculating Consultant's Asset Sale Fee hereunder, *purchase price consideration* shall include the value of the following: all cash, promissory note obligations, assumed liabilities, and all other consideration in any form paid, given, granted or conveyed to Client (or its representatives or assignees) by any buyer to purchase Assets.  If Client and Alliance cannot agree on the purchase price consideration against which Alliance's Asset Sale Fee is calculated, then a valuation expert shall be selected as follows: (1) Alliance shall select and designate the Colorado office of an independent accounting firm to serve as the purchase price valuation expert; (2) such expert shall determine the value of the purchase price consideration and Alliance's Asset Sale Fee in accordance with the criteria set forth in this paragraph; and, (3) the fees of any such valuation shall be paid equally by the parties.  Notwithstanding the foregoing, any success fees approved by the Bankruptcy Court will be final and binding to both parties.

  **b. Court Approval Required.**  Alliance acknowledges that in a Chapter 11 reorganization case, its fees and costs are subject to Bankruptcy Court approval and that payment shall be in accordance with local practice.  Final payment, approved by the Bankruptcy Court, shall be binding to all parties.

**2.3 Litigation Support.**  Should Alliance be required to provide testimony, discovery documents, depositions or other activities related to its work hereunder, Client agrees to fully reimburse Alliance for all its documented expenses for providing such litigation support including,

2

but not limited to, out-of-pocket expenses, legal fees, preparation time, and time providing testimony, depositions, affidavits, sworn statements and/or interviews.  Alliance's professional time for such work shall be billed hourly at the respective rates listed above.

**2.4** **Collection.**  If Alliance initiates any suit or collection action for non-payment, Alliance shall be entitled to recover its reasonable legal costs, expenses and attorneys fees.

**2.5** **Survival.**  Client's obligation to pay Alliance's fees and other compensation set forth in this Section 2, as well as any other provision of this Agreement that is reasonably intended to survive termination, shall be deemed to survive the termination of this Agreement.

## 3.     Other Business Terms

**3.1** **Termination.**  Either party may terminate this Agreement upon ten (10) days written notice.  Upon termination, Client shall be obligated to pay to Alliance any portion of Alliance's fees that have been earned in part or in full but remain unpaid at the time of such termination, including any Success Fees that may become due subsequent to termination.

**3.2** **Client's Representation.**  Client warrants and represents to Alliance that as of the date of this Agreement, Client has fully paid all employee withholding obligations, including, but not limited to, workers' compensation, FICA, tax obligations, state and federal unemployment, all employee benefits (excluding vacation pay and sales commissions, for which Client is solely responsible), and all other employee benefits and withholding obligations of whatever kind or nature.

**3.3** **Indemnity and Limitation of Liability.**  If, in connection with any work, services or matters that are the subject of this Agreement, Consultant (for purposes of this section, "Consultant" shall include both Consultant and its officers, directors, employees and agents) becomes involved in any capacity in any action or legal proceeding, pending or threatened, Client agrees (a) to reimburse Consultant for the reasonable legal fees, disbursements, and other expenses including the cost of investigation and preparation incurred by Consultant as such fees, disbursements and expenses are incurred, and (b) Client agrees that it shall defend (with counsel selected by Consultant), indemnify and hold Consultant harmless, against any and all losses, claims, damages, liabilities, joint or several, to which Consultant may become subject arising out of any such claim, action or legal proceeding, including, but not limited to, employee or government claims (and any fines or penalties relating thereto) for failure to pay any employee withholding obligation or benefits; claims of any creditor, shareholder, customer, employee, supplier or other party relating in any way to the decline, damage to or failure of Client's business; or, Client's failure to pay any obligation when due.  The indemnity and defense protections provided by this section shall not apply if a court of appropriate jurisdiction determines that the claims made against Consultant were the result of Consultant's gross negligence or willful misconduct. Client further agrees that Consultant's liability for any and all claims for damages that Client may have against Consultant shall be limited in their aggregate amount to the dollar value of the fees actually paid to Consultant by Client for professional services rendered.  The protections afforded to Consultant under this section are subject to the review and approval of the bankruptcy court.

**3.4** **Insurance.**  Client shall immediately list Smith, Alliance and the consulting professionals assigned to this engagement as additional insureds under its - and/or the Company's - Directors and Officers ("D&O") liability coverage and other appropriate insurance coverages and to provide evidence of such listing and coverage.

**3.6** **Miscellaneous**

**3.6.1**   The parties agree that any and all disputes between them, and any claim by either party that cannot be amicably settled, including but not limited to claims of fraud in the inducement, shall be determined solely and exclusively by binding arbitration in accordance with the rules of the American Arbitration Association.  Nothing contained in this Agreement shall bar the right of either party to obtain injunctive or preliminary injunctive relief under the usual rules of equity against acts or threatened conduct that will cause damage or irreparable harm to the moving party.

**3.6.2**   Client agrees that all work papers prepared by Alliance are the property of Alliance; copies of Alliance's work product shall be made available to Client upon reasonable request.

**3.6.3**   Client acknowledges that it is entering into this Agreement without any promises or

3

or through this engagement.

**3.6.4** There shall be no changes or modifications to this Agreement, and none shall be implied or binding, unless both parties agree to such changes or modifications in writing.

**3.6.5** Facsimile copies of this Agreement, signed in counterpart, shall be considered for all purposes, including delivery, the same as originals.

**3.6.6** The provisions of this Agreement shall, where it is reasonably anticipated to fulfill their essential or intended purpose, survive the expiration period of this Agreement, including any extensions hereof.

**3.6.7** This Agreement embodies the whole and entire agreement between Client and Alliance. There are no promises; terms, conditions or obligations other than those contained herein. This Agreement shall supersede all previous agreements, communications and representations made by or between the parties with or to one another.

**ALLIANCE**
*Alliance Management*

By: _____
Its: *President*

**CLIENT**
*Ajubeo, LLC*

By: _____
Its: *Board Member*

PSA - Ajubeo CRO Agreement v5 – 08 25 17

4