**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF COLORADO**

| | |
|---|---|
| In re:<br><br>AJUBEO LLC,<br>EIN: 45-2467444,<br><br>Debtor. | Case No. 17-17924-JGR<br><br>Chapter 11 |

**MOTION OF DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS:**
**(A) AUTHORIZING POSTPETITION FINANCING; (B) GRANTING § 364(c) LIENS**
**AND A SUPERPRIORITY ADMINISTRATIVE CLAIM; (C) APPROVING**
**POSTPETITION FINANCING AGREEMENT WITH GREEN HOUSE DATA, INC. AS**
**LENDER; (D) SETTING A FINAL HEARING; AND (E) GRANTING RELATED**
**RELIEF**

Ajubeo LLC (the "**Debtor**"), the debtor and debtor in possession in the above-captioned case, hereby submits this *Motion of Debtor for Entry of Interim and Final Orders: (A) Authorizing Postpetition Financing; (B) Granting § 364(c) Liens and a Superpriority Administrative Claim; (C) Approving Postpetition Financing Agreement with Green House Data, Inc. as Lender; (D) Setting a Final Hearing; and (E) Granting Related Relief* (the "**Motion**"). The Motion is made pursuant to sections 105(a), 364, and 507 of the United States Bankruptcy Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2081-1, 4001-3, 4001-3APP, and 9013-1 of the Local Bankruptcy Rules (the "**Local Rules**"). The Motion is supported by the *Affidavit of Alex Smith in Support of Motion Seeking Expedited Entry of Orders* (the "**Smith Affidavit**"), filed contemporaneously herewith. In further support, the Debtor respectfully states as follows:

**I.    SUMMARY OF RELIEF REQUESTED**

1.    The Debtor respectfully requests that the Court enter an interim order, substantially in the form of the proposed order attached hereto, granting, *inter alia*, the following relief, on an interim basis (the "**Interim Order**"):

15930009

a. Approving, on an interim basis, the DIP Financing Agreement (as defined below) and authorizing, but not directing, the Debtor to execute, deliver, and perform the DIP Financing Agreement and to obtain financing during the Interim Period (as defined below) in the amounts set forth in the Budget;

b. Authorizing, but not directing, the Debtor to make the payments contemplated by the proposed Budget (as defined below) during the Interim Period;

c. Granting the DIP Lender (as defined below), the postpetition liens and security interests, superpriority claims, and other benefits set forth in the Interim Order to secure the extension of credit under the proposed DIP Financing Agreement during the Interim Period; and

d. Granting the related relief as set forth in the proposed Interim Order.

2. The Debtor further requests that the Court schedule a final hearing (the "**Final Hearing**"), as early as the Court's schedule will permit, to consider granting the relief requested herein on a final basis and entering a final order substantially in the form that will be filed with the Court in advance of the Final Hearing (the "**Final Order**").

3. Pursuant to Bankruptcy Rules 4001(b) and (c)(1)(B) and Local Rule 4001-3(2), the Debtor provides the following summary of the essential terms of the DIP Financing Agreement (all capitalized terms used in the summary below and not otherwise defined in this Motion shall have the meanings ascribed to them in the DIP Financing Agreement or the proposed Interim Order, as applicable):

| **Maximum borrowing available on a final basis:** | $298,000. DIP Financing Agreement § 3. |
|---|---|
| **Interim borrowing limit:** | Initial Advance of $100,000 to cover Interim Period. Subsequent advances to be made in accordance with the approved Budget. *Id.* § 4. |
| **Borrowing conditions:** | Initial Advance of $100,000 to be funded upon entry of Interim Order. Subsequent advances funded as set forth in the approved Budget, provided, however, that Lender's obligation to make subsequent advances is conditioned on entry of Bid Procedures Order (as defined in the DIP Financing Agreement). |

|  | *See id.* § 5. |
|---|---|
| **Interest rate:** | 5% per annum. *Id.* § 9. |
| **Fees, costs and charges paid or payable by Debtor or any other person or entity:** | None. |
| **Maturity:** | November 15, 2017. *See* DIP Financing Agreement § 2 (definition of "Maturity Date") & 8. |
| **Events of default:** | Customary Events of Default for a post-petition loan agreement, plus certain Material Adverse Changes related to Debtor's retention of customers. *See id.* § 26. |
| **Remedies in the event of default:** | Customary remedies for a post-petition loan agreement, including, without limitation, cessation of Advances, termination of DIP Financing Agreement, acceleration, exercise of UCC remedies and other remedies under applicable law. *See id.* § 27. |
| **Use of funds limitations:** | Funds to be used for ordinary operations and administrative expenses, subject to the approved Budget. *See id.* § 6. |
| **Protections afforded under 11 U.S.C. §§ 363 and 364:** | DIP Lender to receive superpriority claim pursuant to 11 U.S.C. § 364(c)(1) and non-priming liens pursuant to 11 U.S.C. §§ 364(c)(2) & (3). *See* Interim Order ¶¶ 3(a) & (g). |
| **Line item budget for both the Interim and Final Order periods:** | See Exhibit A to DIP Financing Agreement. |

4. Pursuant to Bankruptcy Rule 4001(c)(1)(B) and Local Rules 4001-3(a) and 4001-3APP, the Debtor highlights the following additional provisions in the DIP Financing Agreement and proposed Interim Order:

| **Cross-collateralization:** | None. |
|---|---|
| **Provisions or findings of fact regarding validity, perfection or** | None. |

15930009

| | |
|---|---|
| **amount of secured party's lien or debt that bind the estate:** | |
| **Provisions or finding of fact regarding relative priority of secured party's lien or debt and the lien or debt of a person not party to the stipulation:** | The DIP Facility Liens are expressly made junior to all other known liens. |
| **506(c) waivers:** | None. |
| **Provisions divesting Debtor of discretion in formulating a plan, administering the estate, or limiting access to the court to seek appropriate relief:** | There are prohibitions against the entry of certain orders adverse to the DIP Lender absent consent or absent payment in full of all Obligations. Among other things, the DIP Lender' commitment will terminate if the Debtor obtains additional debt under Bankruptcy Code section 364 absent the DIP Lender' consent. DIP Financing Agreement §§ 24 & 25; Interim Order ¶ 3(f). |
| **Releases of liability for creditor's alleged prepetition torts or breaches of contract:** | None. |
| **Waivers of avoidance actions:** | None. Avoidance actions and proceeds thereof are expressly excluded from the Collateral securing the DIP Facility Liens. *See* DIP Financing Agreement § 12(b). |
| **Automatic stay relief:** | The Interim Order does not contain any provisions modifying or waiving the automatic stay.<br><br>Under the DIP Financing Agreement, upon an Event of Default, the DIP Lender has the right to seek relief from stay on an expedited basis, and the Debtor shall not contest Lender's request to expedite such hearing. |
| **Waivers of procedural requirements for foreclosure mandated under applicable non-bankruptcy law:** | The Interim Order does not contain any such waivers. |
| **Adequate protection provisions that create liens on claims for relief arising under sections 506(c), 544, 545, 547, 548 and** | None. Avoidance actions and proceeds thereof are expressly excluded from the Collateral securing the DIP Facility Liens. *See* DIP Financing Agreement |

4

15930009

| | |
|---|---|
| **549 of the Bankruptcy Code:** | § 12(b); Interim Order ¶ 3(b). |
| **Waivers effective on default or expiration, of the debtor's right to move for a court order pursuant to section 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent:** | None. |
| **Findings of fact on matters extraneous to the approval process:** | None. |

5. As explained in Section V.H, *infra*, the provisions identified above are necessary and appropriate under the circumstances and the product of extensive arms' length negotiations.

## II. INTRODUCTION

6. This Motion seeks authority to borrow up to an aggregate amount of $250,000 in postpetition financing (the "**DIP Financing**") pursuant to that certain *Post-Petition Loan and Security Agreement* (the "**DIP Financing Agreement**," a copy of which is attached hereto as **Exhibit A**), dated as of September 5, 2017, by and between the Debtor, as borrower, and Green House Data, Inc. (the "**DIP Lender**"), as lender. The Debtor seeks authority, on an expedited basis, to borrow in accordance with the Budget (as defined below) on an interim basis (the "**Interim DIP Financing**") until such time as the Court enters a final order with respect to this Motion (the "**Interim Period**"). If approved by the Court, the DIP Financing Agreement will grant the DIP Lender a junior lien on substantially all of the Debtor's assets and a superpriority claim pursuant to section 364(c)(1) of the Bankruptcy Code.

7. The DIP Financing and the Interim DIP Financing are critical to the Debtor's operations and ability to fund this chapter 11 case pending completion of the Debtor's anticipated asset sale. Specifically, the Debtor has an immediate need for the Interim DIP

Financing to, among other things, (i) fund payroll for the Debtor's employees, (ii) pay rent and utilities, (iii) pay vendors who are critical to the Debtor's ordinary course operations, and (iv) pay administrative expenses, including professionals' fees and United States Trustee fees in accordance with the budget (the "**Budget**") attached to the DIP Financing Agreement. Without immediate access to the Interim DIP Financing, the Debtor's ability to operate, pay its employees, and preserve the value of its business pending completion of the sale process will be immediately and irreparably jeopardized, resulting in significant harm to the Debtor's estate and creditors.

### III. JURISDICTION AND VENUE

8. The Court has jurisdiction over the Debtor, its estate, and this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are sections 105(a), 364, and 507 of the Bankruptcy Code and Bankruptcy Rules 4001 and 6003.

### IV. BACKGROUND

**A. General Background**

9. On August 25, 2017 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

10. The Debtor is operating its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner, and no official committee has yet been established in this case.

11. The Debtor was founded in 2011 and is headquartered in Boulder, Colorado. The Debtor is a provider of cloud infrastructure services, providing data storage, backup, disaster recovery, and virtual desktop capabilities. It leases server equipment from four equipment

15930009

lessors.[1] The Debtor's customers are companies that rely on the Debtor for secure data storage with leading up-time and cloud speed at a lower cost of ownership.

12. The Debtor has entered into a stalking horse asset purchase agreement with DIP Lender for the sale of substantially all of the Debtor's assets. The Debtor will file a motion seeking approval of bidding procedures for the asset sale.

13. Additional factual background regarding the Debtor is set forth in the Smith Affidavit.

B. **The Debtor's Existing Secured Debt**

14. Silicon Valley Bank ("**SVB**") holds a secured claim in the approximate amount of $630,000, secured by substantially all assets of the Debtor (excluding intellectual property) pursuant to that certain Loan and Security Agreement, dated as of May 12, 2014 (as amended), and perfected with a UCC Financing Statement filed on May 13, 2014.

15. Integrity Capital Income Fund, Inc. ("**Integrity**"), also holds a secured claim against the Debtor. Integrity holds a claim in the approximate amount of $915,000, secured by substantially all assets of the Debtor (excluding intellectual property) pursuant to that certain Loan and Security Agreement, dated as of November December 17, 2014 (as amended), and perfected with a UCC Financing Statement filed on December 17, 2014.

16. Pursuant to a Subordination Agreement by and among SVB, Integrity, and the Debtor, Integrity has subordinated any security interest or lien that it may have in any property of the Debtor to the security interest or lien of SVB, notwithstanding the respective dates of attachment or perfection of SVB's and Integrity's respective security interests or liens.

---

[1] The Debtor believes that certain of the equipment "leases" are disguised financings. The Debtor reserves all rights as to the characterization of its equipment "leases."

7

15930009

17. In addition to the SVB and Integrity secured claims, the Debtor leases[2] servers from Farnam Street Financial, Inc. ("**Farnam**"), Hewlett-Packard Financial Services Company ("**HP**"), Data Sales Co., Inc. ("**Data Sales**"), and CSC Leasing Company ("**CSC**"). As of the Petition Date, the approximate arrearages owed to Farnam, HP, Data Sales, and CSC under their respective equipment leases are $886,822.97, $122,942.05, $17,501.03, and $63,391.04, respectively. To the extent that the equipment leases are deemed capital leases, such debts owed to the equipment lessors may be secured or partially secured claims.

C. **The Debtor's Liquidity Issues, Efforts to Obtain Alternative Financing, and DIP Financing Negotiations**

18. As of the Petition Date, the Debtor had approximately $6,500 in available cash. As of the date hereof, the Debtor has approximately $11,600 in available cash, an amount that is not sufficient to meet the Debtor's imminent ordinary course business expenses. The Debtor cannot survive as a going concern absent postpetition financing. The Debtor firmly believes that it is in the best interests of creditors and the estate for the Debtor to maintain its ordinary business operations while it markets and sells its assets pursuant to a competitive bidding process. If there is any disruption in the business, the asset sale may be jeopardized, which, in turn, would jeopardize distributions to creditors. The DIP Financing will sustain the Debtor for the period during which the Debtor intends to conduct the auction process and close the sale of its assets to the successful bidder.

19. The Debtor reached out to its existing secured lenders before and after the Petition Date, but neither was willing to provide postpetition financing. In light of the unwillingness of other parties to provide financing on equal or better terms, the Debtor focused on negotiations with DIP Lender, who was a natural provider of financing given its status as the proposed

---

[2] As noted, the Debtor reserves all rights to dispute the characterization of any purported equipment "lease."

15930009

stalking horse bidder. The DIP Financing Agreement was negotiated through a good faith, arms' length process. The Debtor and DIP Lender negotiated extensively over the amount and terms of the DIP Financing Agreement. On September 5, 2017, the parties reached an agreement on terms and entered into the DIP Financing Agreement.

## V. BASIS FOR RELIEF

### A. Legal Standard

20. "It is given that most successful reorganizations require the debtor-in-possession to obtain new financing simultaneously with or soon after the commencement of the Chapter 11 case." *In re Ames Department Stores, Inc.*, 115 B.R. 34, 36 (Bankr. S.D.N.Y. 1990). Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, then the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in sections 503(b) or 507(b) of the Bankruptcy Code, (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c).

21. A court may not approve secured or superpriority financing under section 364(c) of the Bankruptcy Code "unless the debtor demonstrates that it has reasonably attempted, but failed, to obtain unsecured credit under sections 364(a) or (b)." *In re Ames*, 115 B.R. at 37. A debtor need not seek unsecured financing proposals from every possible lender or lending source before seeking to incur secured postpetition financing, but should make a reasonable effort to seek other sources of less onerous financing. *Id.* at 40; *see also In re Showshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986).

9

22. Assuming the statutory predicates for postpetition financing have been met, courts generally defer to a debtor's business judgment so long as the financing does not contain terms that the leverage the bankruptcy process for the benefit of a third party over the estate and does not unfairly cede control of the reorganization process to a single non-debtor party. *E.g.*, *In re Ames*, 115 B.R. at 40; *In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010). Similarly, this Court has previously explained the role of a debtor's business judgment in decisions to obtain postpetition financing as follows:

> As a debtor-in-possession, Simpco has authority to operate the business. The authority to operate that business necessarily includes the concomitant discretion to exercise reasonable judgment in ordinary business matters. The business of this debtor-in-possession includes oil and gas drilling operations. Simpco's best business judgment indicates these drilling operations are necessary and reasonable for the benefit of the estate. The discretion to act with regard to business planning activities is at the heart of the debtor's power. In exercising Simpco's business judgment of conducting its drilling operations, it has found it necessary to obtain loans to make these endeavors possible. This is in accordance with the exercise of its sound business discretion.

*In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) (citations omitted). This Court further noted that "business judgments should be left to the board room and not to this Court." *Id.*

**B.  The Debtor Has an Immediate Need for Financing**

23. As explained above and in the Smith Affidavit, unless the Debtor is authorized to obtain postpetition financing, the Debtor will not have sufficient available sources of working capital to operate in the ordinary course of business and fund administrative claims incurred in this case. The Debtor's ability to maintain business relationships with its vendors and customers, to pay its employees, and to otherwise fund its operations, is essential to the Debtor's continued viability and preservation and maintenance of the going concern value of the Debtor pending completion of the asset sale process.

### C. The DIP Financing Will Benefit the Estate

24. The proposed DIP Financing will allow the Debtor to proceed with its efforts to maximize value by selling its assets as a going concern. Without adequate financing, the Debtor would likely need to cease operations and liquidate, which would disrupt the going concern sale process and irreparably harm the value that can be realized for the benefit of creditors and the Debtor's estate.

### D. No Superior Financing Alternative Available

25. As explained above and in the Smith Affidavit, the Debtor sought alternative sources of postpetition financing leading up to and following the Petition Date. The Debtor contacted SVB and Integrity, the existing secured lenders, but neither was willing to provide postpetition financing. The DIP Lender, as the proposed stalking horse bidder, was the only party willing to provide postpetition financing on a secured or unsecured basis. Under the circumstances, the DIP Financing is the best and only option available to the Debtor.

### E. Adequacy of Budget

26. The Debtor, with the assistance of its advisors, has compiled the Budget based on all historical costs of operation, reasonable projections regarding future operations, and the added costs of operating under chapter 11 of the Bankruptcy Code, including professionals' fees. The Debtor submits that the Budget is adequate based on all available information.

### F. The DIP Financing Represents a Reasonable Exercise of the Debtor's Business Judgment

27. After appropriate investigation and analysis and given the exigencies associated with the Debtor's bankruptcy filing, the Debtor's management has concluded that the DIP Financing is the best and only available option in the circumstances of this case. Bankruptcy courts routinely defer to the debtor's business judgment with respect to such matters, as "[m]ore

exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

28. Here, the Debtor has exercised sound business judgment in determining that the DIP Financing is appropriate, and the Debtor has satisfied the legal prerequisites to borrow under the DIP Financing Agreement. The terms of the DIP Financing Agreement are fair and reasonable and in the best interests of the Debtor's estate. Nor does the DIP Financing unfairly leverage the bankruptcy process in favor of the DIP Lender or cede control of the reorganization to the DIP Lender.

29. Indeed, the DIP Financing Agreement contains several features that demonstrate its fairness and reasonableness. Most importantly, the DIP Lender has agreed to accept a junior lien on the Debtor's assets. Thus, there are no liens that will be "primed" by the DIP Financing. In addition, the 5% interest rate on the DIP Financing is fair and reasonable given the risks associated with providing postpetition financing. These provisions, among others, demonstrate that the DIP Financing is fair, reasonable, and the best option available to the Debtor.

**G. The DIP Financing Was Negotiated in Good Faith**

30. As set forth in the Smith Affidavit, the DIP Financing Agreement was negotiated in good faith and at arms' length between the Debtor and the DIP Lender, with all parties represented by counsel. As a result of these negotiations, the Debtor was able to negotiate favorable terms for the DIP Loan, including a relatively low interest rate and a junior, non-priming lien. Accordingly, the Debtor believes that any credit extended under the terms of the Interim Order is extended in good faith by the DIP Lender as that term is used in section 364(e) of the Bankruptcy Code.

15930009

**H.**     **Justification for Certain Provisions in the Proposed Interim Order and Final Order**

31.     As noted above, the proposed Interim Order, Final Order, and DIP Financing Agreement contain certain provisions that appear in the Appendix at Local Rule 4001-3APP. Each such provision was specifically required by the DIP Lender and the DIP Lender indicated that it would not provide the DIP Financing absent such provisions. The DIP Financing provided by the DIP Lender represents the only viable source of financing for the Debtor and, given the material benefits of the DIP Financing, without which the Debtor would not be able to pursue its going concern asset sale, the Debtor believes that these provisions are necessary and justified. Indeed, by obtaining the proposed financing from the DIP Lender, the Debtor will have the best opportunity to preserve and maximize value by continuing its operations and paying the operating and restructuring costs and expenses projected to be incurred in the Budget.

32.     The Debtor negotiated the terms of the DIP Financing in good faith and obtained the best possible deal that it could under the circumstances. As indicated above, the Debtor was able to obtain very favorable terms through the negotiation process. Among other things, the DIP Lender agreed to accept a junior lien that will not "prime" any other secured creditors, and the DIP Financing does not include any upfront fees or costs or prepayment penalties. As such, the Debtor respectfully submits that the DIP Lender provided fair consideration for the DIP Financing and the terms highlighted above.

33.     For these reasons, the Debtor respectfully asserts that the inclusion of each of the highlighted provisions is justified under the circumstances and should be approved.

**VI.**     **SATISFACTION OF RULE 4001(c)(2)**

34.     Bankruptcy Rule 4001(c)(2) provides that within the first 14 days after service of a motion for postpetition financing, the court "may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."

13

FED. R. BANKR. P. 4001(c)(2). As described above and in the Smith Affidavit, the Debtor will likely have to cease operations and liquidate if the relief requested in this Motion is not granted. Accordingly, entry of the Interim Order is necessary to avoid immediate and irreparable harm to the estate pending entry of the Final Order.

### VII. PROPOSED FINAL HEARING AND NOTICE PROCEDURES

35. The Debtor proposes that it serve a copy of the Interim Order within three business days of its entry, together with a notice (in conformity with Local Rule 9013-1) of the Final Hearing on the Motion, by overnight mail, facsimile, email, or hand delivery, on the Notice Parties (as defined below) and on any party that files a request for notice pursuant to Rule 2002 of the Bankruptcy Rules.

36. The Debtor requests that the Court set an objection deadline for objections to the Final Order, which deadline will be included in the notice referenced above.

### VIII. NOTICE

37. In compliance with Local Rule 2081-1(b), notice of this Motion has been or will immediately be provided by the Debtor, whether by facsimile, email, overnight mail, or hand delivery, to: (i) the United States Trustee for the District of Colorado; (ii) the Debtor's twenty largest non-insider unsecured creditors; (iii) the IRS and the other government entities listed on the Certificate of Service filed concurrently herewith; (iv) each entity known to assert a security interest or lien in assets of the Debtor; (vii) counsel to the DIP Lender; and (viii) all parties requesting notices pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**"). The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

14

15930009

**WHEREFORE**, the Debtor respectfully requests that the Court (i) enter the Interim Order; (ii) schedule the Final Hearing and approve the Debtor's proposed notice procedures with respect thereto; (iii) following the Final Hearing, enter a Final Order granting the relief requested herein; and (iv) grant such other relief as the Court deems just and proper.

Dated September 5, 2017.

        Respectfully submitted,

        BROWNSTEIN HYATT FARBER SCHRECK, LLP

        *s/ Joshua M. Hantman*
        Michael J. Pankow, #21212
        Joshua M. Hantman, #42010
        Samuel M. Kidder, #49125
        410 17th Street, Suite 2200
        Denver, Colorado 80202
        Telephone: (303) 223-1100
        Facsimile: (303) 223-1111
        mpankow@bhfs.com
        jhantman@bhfs.com
        skidder@bhfs.com

        *Attorneys for Debtor*

15930009