# EXHIBIT 1

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (the "**Agreement**") is entered into as of September 5, 2017 (the "**Effective Date**") by and among AJUBEO LLC, a Colorado limited liability company and Debtor-in-Possession in the Chapter 11 Case (as defined herein) (the "**Debtor**"), having its principal office located at 1470 Walnut Street, Suite 400, Boulder, Colorado 80302, and GREEN HOUSE DATA, INC., a Wyoming corporation, or its assigns (the "**Buyer**").

## RECITALS

A.     Debtor is engaged in the business of providing cloud infrastructure services and solutions (the "**Business**").

B.     On August 25, 2017, Debtor filed a voluntary petition (the "**Petition**") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. Sections 101 et seq. (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Colorado (the "**Bankruptcy Court**"), commencing a federal bankruptcy case in respect of Debtor, Case No. 17-17924-JGR (the "**Chapter 11 Case**").

C.     Debtor wishes to sell to Buyer, and Buyer wishes to purchase from Debtor, certain of the assets of Debtor relating to the Business, and Debtor wishes to assume and assign to Buyer, and Buyer wishes to accept from Debtor, certain executory contracts or unexpired leases pursuant to the terms of this Agreement, all in the manner and subject to the terms and conditions set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto intending to be legally bound, agree as follows:

## ARTICLE I

## SALE AND PURCHASE OF ASSETS; CLOSING

1.1     Certain Terms.  Certain capitalized terms used in this Agreement are defined in Article IX.

1.2     Purchase and Assignment of Purchased Assets.  Subject to the terms and conditions of this Agreement, Debtor shall sell, convey, assign and transfer to Buyer all of Debtor's right, title and interest in and to all assets identified in Schedule 1.2(a) and Schedule 1.2(b) arising out of, relating to or used in connection with the Business (such assets collectively, the "**Purchased Assets**" and each, a "**Purchased Asset**"), and Buyer shall purchase, assume and acquire from Debtor all of Debtor's right, title and interest in and to the Purchased Assets, at the Closing, free and clear of all Encumbrances, for the Purchase Price determined as provided for in this Agreement.  The Purchased Assets include, and are expressly limited to, the following:

15932879

(a)     The executory contracts identified on Schedule 1.2(a) (collectively, the "**Assumed Contracts**") and all contractual rights thereto to the extent assumed by Debtor and assigned to Buyer in accordance with Section 1.4 below.

(b)     All Equipment specifically identified on Schedule 1.2(a), together with any express or implied warranties from manufacturers or suppliers thereof (or any components thereof) pertaining thereto.

(c)     All rights or title to any data or other electronic media residing on any Equipment being utilized by the Debtor related to any of the Assumed Contracts.

(d)     All goodwill and other intangible assets, including customer lists and contact information, mailing lists and email lists related to the Assumed Contracts.

(e)     All accounts receivable of Debtor for any of the Assumed Contracts as of the Closing Date which are less than 90 days old.

(f)     All files, documents, instruments, papers, computer files and records and all other books and records of the Debtor in any media relating to the Assumed Contracts, including, but not limited to, all records relating to studies, reports, budgets, forecasts, projections, warranties, and all other records and information relating to the Purchased Assets (collectively the "**Files and Records**").

(g)     All Company IP and any other right, title or interest in or to all other forms of Intellectual Property, including but not limited all interest in and right to use any trademarks, URLs, phone numbers, websites, the name "Ajubeo" and the domain name "ajubeo.com"

1.3     Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed an agreement to sell, transfer, assign or convey any assets from Debtor to Buyer not expressly identified in Section 1.2 above (collectively the "**Excluded Assets**").  Debtor shall retain all right, title and interest to, in and under, and all obligations with respect to, the Excluded Assets.  For purposes of clarification, the term "**Excluded Assets**" includes the following items, assets and properties of Debtor (whether or not such assets are otherwise described in Section 1.2) as of the Closing (and each, an "**Excluded Asset**"):

(a)     Debtor's cash and cash equivalents as of the Closing Date and any depository, checking or other accounts maintained by Debtor at any bank or financial institution;

(b)     Debtor's minute books and stock books.

(c)     Any Equipment and other tangible personal property, together with any express or implied warranties from manufacturers or suppliers thereof (or any components thereof) that is the subject of any lease that is not expressly assumed by Buyer in Section 1.2 above.

(d)     Any Avoidance Actions.

(e)     All assets of the Debtor not otherwise identified in Section 1.2 and Schedules 1.2(a) and 1.2(b).

- 2 -

15932879

(f)     Any agreements related to the payment of any commissions or other compensation due any third party related to any of the Assumed Contracts.

(g)     Any leases related to any real property or Equipment leased by the Debtor not expressly identified in Section 1.2 or Schedules 1.2(a) or 1.2(b).

(h)     All accounts receivable of Debtor for any of the Assumed Contracts as of the Closing Date which are 90 days old or more, and all accounts receivable of Debtor for any contracts that are not Assumed Contracts.

1.4     <u>Executory Contracts</u>.

(a)     Subject to its right to withdraw such designation, Buyer hereby designates the contracts listed in Schedule 1.2(a) as contracts to be assumed by Debtor and assigned to Buyer pursuant to this Asset Purchase Agreement (the "**Assumed Contracts**").  The Debtor shall seek the approval of the Bankruptcy Court of the following procedures for the assumption and assignment of the Assumed Contracts:

The Debtor shall, within two (2) business days after the entry of the Bid Procedures Order, file and serve on each of the non-debtor counterparties (each a "**Counterparty**") each executory contract and unexpired lease of the Debtor (the "**Contracts**") a notice (the "**Assignment Notice**") specifying the Cure Cost, if any, Debtor believes is necessary to assume each of the Contracts and the potential for the Debtor to assume and assign such agreements to the Successful Bidder.  The Assignment Notice may also identify any additional terms or conditions of assumption and assignment and the identity of Buyer.  If the Debtor identifies additional executory contracts or unexpired leases that might be assumed by the Debtor and assigned to the Buyer or other Successful Bidder not set forth in the original Assignment Notice, the Debtor shall promptly send a supplemental notice (a "**Supplemental Assignment Notice**") to the applicable counterparties, and such additional contracts or leases shall be deemed Contracts for purposes of the Bid Procedures Order.

Objections, if any, to the proposed Cure Costs, or to the proposed assumption and assignment of the Contracts must be in writing and filed with the Court and served on the Notice Parties (as defined hereinafter) so as to be received no later than five (5) business days prior to the Bid Deadline (the "**Designation and Cure Objection Deadline**"), or such other deadline as is set by the Bankruptcy Court.

Within twenty-four (24) hours after the conclusion of the Auction, the Debtor shall file a notice (the "**Notice of Successful Bidder and Assumed Contracts**"), which shall state (i) the identity of the Successful Bidder, and (ii) the Contracts that the Debtor proposes to assume and assign to the Successful Bidder.

Where a Counterparty files an objection to the assumption by the Debtor and assignment to the Buyer of such Contract (the "**Disputed Designation**") and/or asserts a cure amount higher than the proposed Cure Costs listed on the Assignment Notice (the "**Disputed Cure Costs**"), the Debtor, the Buyer, and the Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention.  If the Debtor, the Counterparty, and the Buyer determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Disputed

- 3 -

15932879

Designation and/or the amount to be paid under Bankruptcy Code section 365 with respect to the Disputed Cure Costs will be determined by the Court at the Sale Hearing. If the Bankruptcy Court determines at the Sale Hearing that the applicable Assumed Contract will not be assumed and assigned, then such executory contract shall no longer be considered an Assumed Contract, provided, however, that after such determination is made by the Court, the Debtor may propose a new Cure Cost, including providing the applicable Counterparty with the Assignment Notice setting forth the re-designation and proposed new Cure Cost of the Assumed Contract.

If the Counterparty to an Assumed Contract fails to timely object to the assumption and assignment of an Assumed Contract or the proposed Cure Cost relating thereto by the Designation and Cure Objection Deadline, or upon the resolution of any timely objection by agreement of the parties or order of the Bankruptcy Court approving an assumption and assignment, such Assumed Contract shall be deemed to be assumed by the Debtor and assigned to the Buyer, and the proposed Cure Cost related to such Assumed Contract shall be established and approved in all respects, subject to the conditions set forth directly below.

The Debtor's decision to assume and assign the Assumed Contracts is subject to Court approval and consummation of the sale. Accordingly, subject to the satisfaction of conditions in connection with the sale, the Debtor shall be deemed to have assumed and assigned the Assumed Contracts as of the date of and effective only upon the Closing Date (as defined in this Agreement), and absent such closing, each of the Assumed Contracts shall neither be deemed assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtor under the Bankruptcy Code. Also, inclusion of any document on the list of Assumed Contracts shall not constitute or be deemed to be a determination or admission by the Debtor or the Buyer that such document is, in fact, an executory contract within the meaning of the Bankruptcy Code, all rights with respect thereto being expressly reserved.

Notwithstanding anything herein to the contrary, the Buyer, from time to time, may exclude any Assumed Contract in its sole and absolute discretion until the Bid Deadline. The non-debtor party or parties to any such excluded contract or lease will be notified of such exclusion within three (3) business days of such determination.

Any Contract that is not an Assumed Contract shall be deemed rejected as of the Closing Date; *provided*, *however*, that if any Contract to which the Counterparty is Data Sales Co., Inc., or Farnam Street Financial, Inc. is not an Assumed Contract, then such Contract shall be deemed rejected as of the date that is sixty (60) days after the Closing Date.

(b)     As part of the Sale Motion, Debtor shall seek approval by the Bankruptcy Court of the sale, assumption and assignment by Debtor to Buyer of the Assumed Contracts identified in Schedule 1.2(a). Debtor shall serve the Sale Motion on all counterparties to all such Assumed Contracts along with a notice specifically stating that Debtor is or may be seeking the sale, assumption and assignment of such Debtor's Contracts and shall notify such parties of the deadline for objecting to the Cure Costs (as set forth in a schedule of Cure Costs for the Assumed Contracts to be delivered by Debtor to Buyer at least three (3) business days prior to the entry of the Bid Procedures Order), which deadline shall be not less than five (5) business days prior to the Bid Deadline. As part of the Sale Motion, Debtor shall seek authority to file with the Bankruptcy Court the list identifying the Assumed Contracts and the amounts necessary to cure defaults under each of such Assumed Contracts as determined by Debtor, so as to enable any

- 4 -

such party to object to the proposed Cure Costs and the Bankruptcy Court to determine such Cure Costs as promptly as reasonably possible.

      1.5    <u>Purchase Price</u>.

      (a)    Subject to the terms and conditions of this Agreement, the Purchase Price to be paid by the Buyer to the Debtor for the Purchased Assets shall be $1,945,798.00, subject to adjustment based on the Closing AR Amount, as set forth in Section 1.5(b), the November Revenue Amount, as set forth in Section 1.5(c), and certain potential adjustments for equipment, as set forth in Section 1.5(d). The Purchase Price shall be satisfied through a combination of (a) any credit bid for the amount of principal and interest due on any DIP Loan, if any, provided by Buyer, plus (b) the remaining balance in cash, which includes all Taxes and Transfer Taxes due, if any. Of the total Purchase Price, $1,335,798.00 of such amount is referred to as the "**MRR Component**" of the Purchase Price.

      (b)    The Purchase Price shall be subject to adjustment at Closing based on the amount of all accounts receivable due to Debtor for any of the Assumed Contracts that are assigned to Buyer under the terms of this Agreement as of the date of the Closing which are less than 90 days old (the "**Closing AR Amount**"). The Purchase Price assumes a Closing AR Amount of $500,000.00. The Purchase Price shall be adjusted upward, on a dollar for dollar basis, to the extent that the Closing AR Amount exceeds $500,000, and shall be adjusted downward, on a dollar for dollar basis, to the extent that $500,000 exceeds the Closing AR Amount. By way of example only, if the Closing AR Amount is $600,000, then the Purchase Price shall be increased by $100,000. By way of further example only, if the Closing AR Amount is $400,000, then the Purchase Price shall be reduced by $100,000. In the event that the Closing Date occurs after October 31, 2017, then the portion of the Purchase Price that is attributable to accounts receivable invoiced during the month in which the Closing Date occurs shall be prorated based on the number of days that have elapsed in such month. By way of example only, if the Closing Date occurs on November 15, 2017, and the amount of accounts receivable from the Assumed Contracts attributable to invoices from the month of November 2017 equals $200,000, then the portion of the Purchase Price attributable to such accounts receivable shall equal $100,000. Up and to the Bid Deadline, Debtor shall provide Buyer with written notice of any Assumed Contract where the customer has either advised Debtor of its intention to terminate its contract with Debtor or the customer has advised Debtor of its intention to reduce any services being provided under an Assumed Contract. Debtor shall provide this written notice with two (2) business days of Debtor's actual knowledge of any termination or service reduction.

      (c)    The MRR Component of the Purchase Price shall be subject to adjustment at Closing based on the amount of revenue to be invoiced by the Debtor in the month of November 2017 arising from the Assumed Contracts (the "**November Revenue Amount**"). The MRR Component based on the November Revenue Amount as follows:

      (i)    if the November Revenue Amount exceeds $249,900.00, then the MRR Component of the Purchase Price shall be multiplied by the ratio of (i) the November Revenue Amount to (ii) $249,900. By way of example only, if the November Revenue Amount is $260,000, then the MRR Component shall be equal to $1,389,785.83 (*i.e.*, $1,335,798.00 multiplied by the ratio of $260,000 to

$249,900); and

          (ii)     if the November Revenue Amount is less than $207,100.00, then the MRR Component of the Purchase Price shall be multiplied by the ratio of (i) the November Revenue Amount to (ii) $207,100. By way of example only, if the November Revenue Amount is $200,000, then the MRR Component shall be equal to $1,290,002.90 (*i.e.*, $1,335,798.00 multiplied by the ratio of $200,000 to $207,100).

          (d)     The Purchase Price includes $100,000.00 for the HP Equipment identified in Schedule 1.2(b). Debtor has represented to Buyer that it owns the HP Equipment and that it can sell the equipment to Buyer free and clear of any leases, liens or encumbrances. In the event that Debtor is unable to sell the HP Equipment free and clear of any leases, liens, encumbrances, or other claims, Buyer may reduce the Purchase Price by $100,000.00 and not acquire the HP Equipment. The Purchase Price also includes $10,000.00 for certain equipment that was formerly leased by the Debtor from VAR Resources, Inc., or its successors and assigns (the "**VAR Equipment**"). The VAR Equipment is identified in Schedule 1.2(b). In the event that Debtor is unable to sell the VAR Equipment to Buyer free and clear of any leases, liens, encumbrances, or other claims, Buyer may reduce the Purchase Price by $10,000.00 and not acquire the VAR Equipment.

          1.6     <u>Revenue and Expense Allocations</u>. Subject to the provisions of Section 10.14, all revenues and expenses with respect to the Purchased Assets shall be allocated between Debtor and Buyer as provided herein, effective as 12:01 a.m. Denver, Colorado time on the Closing Date (the "**Cut Off Time**"), determined in accordance with sound accounting principles, consistently applied. Except as may otherwise expressly provided for in this Agreement, Debtor shall be entitled to all revenue and shall be responsible for all expenses of or relating to the Purchased Assets incurred during the period of time up to but not including the Cut Off Time, and Buyer shall be entitled to all revenue and be responsible for all expenses of the Purchased Assets incurred during the period of time from, after and including the Cut Off Time.

          1.7     <u>Prorations</u>. Prepaid items under the Assumed Contracts and any accruals shall be prorated between the Debtor and Buyer on the basis of the period of time to which such prepaid items and accruals apply. All prorations under this Section 1.7 shall be subject to the reconciliation provided for in Section 1.9.

          1.8     <u>Payment of Purchase Price</u>. At the Closing, Buyer will pay, pursuant to the applicable terms of this Agreement, the Purchase Price in the form of a credit bid for the balance of its post-petition debt ("**DIP Loan**"), if any, approved in accordance with the terms and conditions of a final order, if any, entered by the Bankruptcy Court approving such DIP Loan, plus the remaining balance in cash as set forth in Section 1.5 above.

          1.9     <u>Reconciliation and Post-Closing Adjustments</u>. Any expenses incurred by (i) Buyer with respect to the Purchased Assets from and after the Cut Off Time, and (ii) Debtor with respect to the Purchased Assets prior to and including the Cut Off Time, shall be promptly allocated in the manner described herein (meaning that Debtor shall be responsible for expenses relating to periods prior to the Cut Off Time and Buyer shall be responsible for expenses relating to periods beginning as of the Cut Off Time). The parties shall promptly pay or reimburse any

15932879

amount due.  For avoidance of doubt, Buyer shall be entitled to any revenue received by Debtor after the Cut Off Time for any revenue received related to the Assumed Contracts.

1.10   <u>Assumed Liabilities</u>.  The Debtor acknowledges that the Buyer shall not assume any Liabilities or obligations of the Debtor except (i) all Liabilities for Cure Costs, if any, for an Assumed Contract, (ii) the obligations of the Debtor relating to the ownership or operation of the Purchased Assets accruing after the Cut Off Time, including any such Liabilities accruing for Taxes applicable to the Purchased assets and all obligations under any of the Assumed Contracts arising after the Cut Off Time, (iii) all Liabilities for Taxes, if any; and (iv) all Liabilities for Transfer Taxes, if any.

1.11   <u>Tax Documents</u>.  The parties shall reasonably cooperate and assist each other in preparing any necessary tax documents required as a result of the transactions set forth in this Agreement.

1.12   <u>Closing</u>.  The Debtor shall seek a waiver of the 14-day stay of effectiveness of the Sale Order.  If such stay is waived, then the purchase and sale of the Purchased Assets shall take place at a closing (the "**Closing**") within three (3) business days after the entry of the Sale Order, or at such other time and place as the parties may agree, subject to the satisfaction or waiver of all of the conditions to Closing set forth in Article VI and Article VII, but in any event, on or before the Outside Date.

1.13   <u>Closing Deliveries</u>.

(a)   At or prior to the Closing, Debtor shall deliver to Buyer:

(i)   A Bill of Sale in a form reasonably acceptable to Debtor and Buyer conveying to Buyer any and all Purchased Assets comprised of personal property, equipment purchased, accounts receivable, and Intellectual Property, duly executed by Debtor;

(ii)   Good standing certificates for the Debtor from the Secretary of State of the State of Colorado, dated within thirty (30) days of the Closing Date;

(iii)   Delivery from Debtor to Buyer of all originals and copies of documents, information or other data relating to the Assumed Contracts in its possession, including without limitation all files and records, all electronic media and data, all originals, or if unavailable a copy, of the Assumed Contracts, a copy of any written notices or other written correspondence between the parties thereto;

(iv)   Adequate documentation establishing that all members of the Debtor have consented to the sale of the Purchased Assets; and

(v)   Such other documents as Buyer may reasonably request.

(b)   At the Closing, Buyer shall deliver to Debtor:

(i)   Such other documents as Debtor may reasonably request.

- 7 -

## ARTICLE II

## POST-CLOSING

2.1     Post-Closing Collections.  Within five (5) business days of its receipt, Debtor shall deliver to Buyer any and all payments that may be paid by or on behalf of the Assumed Contracts to Debtor on or after the Closing Date.  Until such time as the payments are delivered to Buyer, such payments shall be held in trust for the benefit of Buyer pursuant to an express trust created hereby.  No such payments received by Debtor shall be commingled with other funds of the Debtor.

## ARTICLE III

## CERTAIN OTHER AGREEMENTS

3.1     Notification.  The parties hereto shall promptly notify the other party hereto in writing if such party becomes aware of any event, fact or condition that would cause any of such party's representations and warranties in this Agreement to be untrue or incomplete or which makes the satisfaction of the conditions to close the transactions contemplated hereby impossible or unlikely.

3.2     Schedules.  The Schedules attached hereto are an integral part of this Agreement, is incorporated herein by reference, and are not intended to be an independent document.  All capitalized terms used in the Schedules and not otherwise defined shall have the same meanings as in this Agreement, to which the Schedules are attached and made a part of.  The parties will update the Schedules one week prior to the Closing Date.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF DEBTOR

Debtor hereby represents and warrants to Buyer as of the date hereof and as of the Closing Date as follows:

4.1     Organization, Good Standing and Qualification.  The Debtor is a corporation duly organized, validly existing and in good standing under the laws of the State of Colorado and has all requisite corporate power and authority to, subject to the provisions of the Bankruptcy Code applicable to debtors in possession, carry on its business as now conducted and to enter into and consummate this Agreement and the Transaction Documents.

4.2     Authorization; Enforceability.  Subject to the entry of the Sale Order, Debtor has full power and authority to execute and deliver this Agreement and the other Transaction Documents and to perform its obligations hereunder and thereunder.  Subject to the entry and effectiveness of the Bid Procedures Order and the Sale Order, all action on the part of Debtor, its officers, managers and sole member necessary for the authorization, execution and delivery of this Agreement and the other Transaction Documents and the performance of all obligations hereunder and thereunder has been taken as of the Effective Date and, with respect to all Closing

- 8 -

obligations, will be taken prior to the Closing.  Subject to the entry and effectiveness of the Bid Procedures Order and the Sale Order, this Agreement and the other Transaction Documents each constitutes, or when executed and delivered will constitute, a valid and legally binding obligation of Debtor, enforceable in accordance with its terms.

4.3    <u>No Conflict</u>.  Subject to the entry of the Sale Order, the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby will not result in any violation of any Legal Requirements or Order to which Debtor or any of the Purchased Assets, including the Assumed Contracts, is subject or any violation of Debtor's articles of incorporation or bylaws, or be in conflict with or constitute, with or without the passage of time or giving of notice, a default under any such provision, or an event which results in the creation of any Encumbrance upon the Purchased Assets.

4.4    <u>Governmental Authorities; Consents</u>.    No Consent, approval, Order or authorization of, or registration, qualification, designation, declaration or filing with, or notice to, any Governmental Body or other Person on the part of Debtor is required in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby except for entry of the Sale Order and Consents by, or declarations or filings with, the Bankruptcy Court.

4.5    <u>Certain Proceedings</u>.  There is no Proceeding pending or currently threatened against Debtor that questions the validity of this Agreement or the right of Debtor to enter into, or to consummate the transactions contemplated hereby or by any of the Transaction Documents.

4.6    <u>Brokers' Fees</u>.  With exception of any compensation due under any Bankruptcy Court order approving a Chief Restructuring Officer's compensation, no broker, finder, investment banker or other Person is entitled to any brokerage fee, finders' fee or other commission in connection with the transactions contemplated by this Agreement based on arrangements made by Debtor.

4.7    <u>Title to Purchased Assets</u>.  The Debtor owns the Purchased Assets.

## <u>ARTICLE V</u>

## <u>REPRESENTATIONS AND WARRANTIES OF BUYER</u>

Buyer represents and warrants to Debtor, severally and not jointly, as of the date hereof and as of the Closing Date as follows:

5.1    <u>Organization and Good Standing</u>.  Buyer is a corporation duly organized, validly existing, and in good standing under the laws of Wyoming.

5.2    <u>Authorization; Enforceability</u>.  Buyer has full organizational power and authority to execute and deliver this Agreement and the other Transaction Documents and to perform its obligations hereunder and thereunder.  All organizational action on the part of Buyer, such Buyer's officers, general partner and limited partners necessary for the authorization, execution and delivery of this Agreement and the other Transaction Documents and the performance of all

15932879

obligations of such Buyer hereunder and thereunder has been taken or will be taken prior to the Closing. This Agreement and the other Transaction Documents each constitutes, or when executed and delivered will constitute, a valid and legally binding obligation of Buyer, enforceable in accordance with its terms.

      5.3    <u>No Conflict</u>.

      (a)    The execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby will not result in any violation of or be in conflict with or constitute, with or without the passage of time or giving of notice, a default under any provision of any Buyer's Certificate of Limited Partnership or organizational documents or any Order or contract to which such Buyer is a party or by which such Buyer is bound or, to the actual knowledge of each Buyer, any provisions of any Legal Requirement applicable to such Buyer.

      (b)    Buyer is not and will not be required to give any notice to or make any filing with or obtain any Consent from any Person in connection with the execution and delivery of this Agreement or the other Transaction Documents or the consummation of the transactions contemplated hereby and thereby.

      5.4    <u>Governmental Authorities; Consents</u>. No Consent, Order or authorization of, or registration, qualification, designation, declaration or filing with, or notice to, any Governmental Body or other Person on the part of any Buyer is required in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, except for consents already obtained.

      5.5    <u>Certain Proceedings</u>. There is no Proceeding pending or currently threatened against any Buyer that questions the validity of this Agreement or the right of any Buyer to enter into, or to consummate the transactions contemplated hereby or by any of the Transaction Documents.

      5.6    <u>Brokers' Fees</u>. No broker, finder, investment banker or other Person is entitled to any brokerage fee, finders' fee or other commission in connection with the transactions contemplated by this Agreement based on arrangements made by any Buyer.

      5.7    <u>Independent Investigation; Decision to Purchase</u>. Buyer is a sophisticated investor and its decision to purchase the Purchased Assets is based upon its own independent expert evaluations of the Purchased Assets and other materials deemed relevant by such Buyer and its agents. Buyer acknowledges that it has thoroughly examined and inspected the Purchased Assets and, except as expressly set forth in this Agreement, has not in any way relied on any statements or representations made by Debtor, or any of its representatives or agents, as to the Purchased Assets, but has made the decision to purchase the Purchased Assets solely based on its own examination. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE SALE OF THE ASSETS IS MADE WITHOUT REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE OR WARRANTIES AS TO TITLE, AND IS MADE "AS IS", "WHERE IS," AND IS WITHOUT RECOURSE.

15932879

## ARTICLE VI

## CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE

Buyer's obligation to consummate the transactions to occur at the Closing is subject to the satisfaction of the following conditions (which may be waived by Buyer, in their sole discretion, in whole or in part):

6.1     Accuracy of Representations.  Debtor's representations and warranties in this Agreement and in the other Transaction Documents must be accurate in all material respects and shall be true in all respects as written, in each case as of the date of this Agreement and as of the Closing Date as if made on the Closing Date.

6.2     Debtor's Performance.  Debtor shall have performed and complied with all agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by it on or before the Closing, including delivery of the items set forth in Section 1.13(a).

6.3     No Proceedings.  No Proceeding that is not stayed by the Bankruptcy Court shall be pending or threatened wherein an unfavorable Order could (a) prevent consummation of any of the transactions contemplated by this Agreement, (b) cause any of the transactions contemplated by this Agreement to be rescinded following consummation, (c) affect adversely the right of any Buyer to own the Purchased Assets, or (d) affect adversely the right of the Debtor to own its assets and to operate its business as now conducted.

6.4     No Material Adverse Change.  No Material Adverse Change shall have occurred.

6.5     Sale Order and Bid Procedures Order.  Prior to the Outside Date, the Bankruptcy Court shall have entered the Sale Order in accordance with Section 8.3(a) and the Bid Procedures Order in accordance with Section 8.3(b), and neither the Sale Order nor the Bid Procedures Order shall have been stayed.  If the Sale Order and Bid Procedures Order have not been entered prior to the Outside Date, Buyer may terminate this Agreement by written notice to Debtor and thereafter, this Agreement shall be of no further force and effect.

## ARTICLE VII

## CONDITIONS PRECEDENT TO DEBTOR'S OBLIGATION TO CLOSE

Debtor's obligation to consummate the transactions to occur at the Closing is subject to the satisfaction of the following conditions (which may be waived by Debtor in its sole discretion, in whole or in part):

7.1     Accuracy of Representations.  Buyer's representations and warranties in this Agreement and, to the extent there are any, in the other Transaction Documents must be accurate in all material respects as of the date of this Agreement and as of the Closing Date as if made on the Closing Date.

15932879

7.2     Buyer's Performance.     Buyer shall have performed and complied with all agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by it on or before the Closing.

7.3     No Proceedings.  No Proceeding that is not stayed by the Bankruptcy Court shall be pending or threatened wherein an unfavorable Order could (a) prevent consummation of any of the transactions contemplated by this Agreement, (b) cause any of the transactions contemplated by this Agreement to be rescinded following consummation, or (c) affect adversely the Purchased Assets or the right of Debtor to sell the Purchased Assets to Buyer.

7.4     Sale Order and Bid Procedures Order.  The Bankruptcy Court shall have entered the Sale Order in accordance with Section 8.3(a) and the Bid Procedures Order in accordance with Section 8.3(b), and neither the Sale Order nor the Bid Procedures Order shall have been stayed.

## ARTICLE VIII

## SURVIVAL; REMEDIES; BANKRUPTCY COURT APPROVALS; RISK OF LOSS OR CONDEMNATION; GUARANTY

8.1     Survival of Representations and Warranties.  The respective representations and warranties of Buyer and Debtor under this Agreement, or in any certificates or other documents delivered prior to or at the Closing, shall lapse and cease to be of any further force or effect effective on the Closing Date.  On the Closing Date, the respective covenants and agreements of Buyer and Debtor under this Agreement shall lapse and cease to be of any further force or effect except and to the extent that the post-Closing performance of such covenant or agreement is expressly required under this Agreement or such provision expressly survives this Agreement. No post-Closing performance of any such covenant or agreement of Buyer or Debtor shall be deemed waived or otherwise affected by the Closing.

8.2     No Consequential, Speculative or Punitive Damages.  The parties hereto agree that neither party shall have any liability for consequential, speculative or punitive damages.

8.3     Bankruptcy Court Approvals.

(a)     On or promptly after the Effective Date, Debtor shall file a motion (the "**Sale Motion**") for an Order by the Bankruptcy Court approving the sale of the Purchased Assets to Buyer or, if applicable, other Successful Bidder, on the terms and conditions set forth in this Agreement free and clear of all Encumbrances, in form and substance satisfactory to Buyer (such Order the "**Sale Order**").  If requested by Debtor or the Bankruptcy Court, Buyer shall provide adequate assurance of future performance (satisfactory to the Bankruptcy Court) to the counterparties to the Assumed Contracts.  Following the filing of the Sale Motion, Debtor shall use its commercially reasonable efforts to obtain entry of the Sale Order.

(b)     The Sale Motion shall request, among other things, (i) the expedited scheduling of an auction of the assets of Debtor to be commenced not later than **October 30, 2017** (the "**Auction**"), (ii) the Sale Hearing not more than one (1) business day following the completion of the Auction and (iii) the entry of an Order by the Bankruptcy Court (the "**Bid**

- 12 -

**Procedures Order**") approving bidding procedures (the "**Bidding Procedures**") in the form attached hereto as **Exhibit A** subject to any changes thereto as approved by Buyer and Debtor in their reasonable discretion.

(c) In the event that the entry of the Bid Procedures Order or the Sale Order is appealed or a stay pending appeal is sought, Debtor shall oppose the appeal or the stay pending appeal and seek the dismissal of any appeal (including a petition for certiorari, motion for rehearing, reargument, reconsideration or revocation) but, if and only if this Agreement is terminated, then Debtor shall be under no obligation under this Agreement to continue such opposition or to seek any such dismissal following the Outside Date. Notwithstanding the foregoing, any resulting changes to this Agreement or any document, instrument or agreement executed in connection herewith or resulting changes to the Bid Procedures Order and the Sale Order shall be subject to Buyer's approval in their reasonable discretion. Debtor shall consult with Buyer and their representatives concerning the Sale Order, the Bid Procedures Order any other Order of the Bankruptcy Court relating to this Agreement or any document, instrument or agreement executed in connection herewith, and the bankruptcy proceedings in connection therewith and provide Buyer with copies of requested applications, pleadings, notices, proposed Orders and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court so as to permit Buyer sufficient time to review and comment on such applications, pleadings, notices, proposed Orders and other documents, and proposed Orders shall be in form and substance reasonably acceptable to Buyer. Debtor shall give Buyer reasonable advance notice of any hearings regarding the motions required to obtain the issuance of the Sale Order and Buyer shall have the right to attend and seek to be heard at any such hearings. Debtor further covenants and agrees that, after the Closing, the terms of any reorganization plan it submits to the Bankruptcy Court or any other court for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including, any transaction contemplated by or approved pursuant to the Bid Procedures Order or the Sale Order.

8.4  <u>Risk of Loss</u>. In the event of damage or destruction to any Purchased Assets or any portion thereof prior to the Closing, Buyer may elect to (i) proceed with the transaction and receive the insurance proceeds, if any, resulting from such damage or destruction, or (ii) designate the applicable Assumed Contract as an Excluded Contract; <u>provided</u> that (a) such designation shall be made by written notice from Buyer to Debtor within ten (10) days of receipt of notice of such damage or destruction, and (b) Buyer's rights and obligations under this Agreement with respect to such Assumed Contract shall cease as of the date of the designation notice. If such Assumed Contract is not designated by Buyer an Excluded Contract as a result of such casualty, all insurance proceeds shall be held and disposed of in accordance with the provisions of the applicable Assumed Contract and upon the Closing Debtor shall assign or deliver to Buyer all rights of Debtor thereto, if any, and Buyer shall receive a credit at Closing in the amount of any deductible under such insurance policy.

8.5  <u>Condemnation</u>. If any Purchased Asset or any material portion thereof or any access thereto is taken by eminent domain or becomes subject to any condemnation or eminent domain proceeding prior to the Closing, then Buyer shall have the option to proceed with this transaction and to receive an assignment of any condemnation proceeds or award (or have the Purchase Price reduced by any proceeds or awards paid to Debtor), or designate the applicable

- 13 -

15932879

Assumed Contract as an Excluded Contract provided that (a) such designation shall be made by written notice from Buyer to Debtor within ten (10) days of receipt of notice of such proceeding, and (b) Buyer's rights and obligations under this Agreement with respect to such Assumed Contract shall cease as of the date of the designation notice. If such Assumed Contract is not designated by Buyer as an Excluded Contract as a result of a condemnation, all condemnation proceeds shall be held and disposed of in accordance with the provisions of the applicable Assumed Contract and upon the Closing Debtor shall assign or deliver to Buyer all rights of Debtor thereto, if any.

## **ARTICLE IX**

## **DEFINITIONS**

9.1    Definitions. In this Agreement, the following terms have the meanings set forth below, which shall be equally applicable to both the singular and plural forms. Any agreement referred to below shall mean such agreement as amended, supplemented and modified from time to time to the extent permitted by the applicable provisions thereof and by this Agreement.

"Agreement" means this Purchase Agreement, as amended or supplemented or otherwise modified from time to time in accordance with the terms hereof.

"Allocation Schedule" has the meaning set forth in Section 1.11.

"Assignments" has the meaning set forth in Section **Error! Reference source not found.**.

"Assumed Contract" means any Debtor's Contract that is designated by Buyer as a Assumed Contract under, or becomes a Assumed Contract by operation of Section 1.4.

"Auction" has the meaning set forth in Section 8.3(b).

"Avoidance Actions" means, collectively, all preference or avoidance claims and actions of Debtor, including any such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code and any similar or corresponding claims or actions arising under state law.

"Bankruptcy Code" has the meaning set forth in the Recitals hereto.

"Bankruptcy Court" has the meaning set forth in the Recitals hereto.

"Bid Deadline" has the meaning set forth in the Bid Procedures Order.

"Bidding Procedures" has the meaning set forth in Section 8.3(b).

"Bid Procedures Order" has the meaning set forth in Section 8.3(b).

"Buyer(s)" has the meaning set forth in the preamble to this Agreement.

"Chapter 11 Case" has the meaning set forth in the Recitals hereto.

15932879

"Closing" has the meaning set forth in Section 1.12.

"Closing AR Amount" has the meaning set forth in Section 1.5.

"Closing Date" means the date on which the Closing actually occurs which, in any event, will be on or before the Outside Date.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company IP" means any Intellectual Property: (i) owned or licensed by the Debtor or otherwise held for use by the Debtor; or (ii) utilized in, necessary for, or incident to the conduct of the Business in any manner as currently conducted.

"Consent" means any approval, consent, ratification, waiver, or other authorization, including without limitation, any governmental authorization.

"Contract" has the meaning set forth in Section 1.4(a).

"Cure Costs" means the sum of the amount required to be paid as a cure amount under Section 365 of the Bankruptcy Code so that Debtor may sell, assume and assign any Assumed Contract to Buyer.

"Cut Off Time" has the meaning set forth in Section 1.6.

"Debtor" has the meaning set forth in the Preamble to this Agreement.

"Debtor's Contract" means any Contract (a) to which Debtor is a party or by which Debtor is bound and (b) that is related to the Business.

"Debtor's Knowledge" means that Debtor's representatives are actually aware of such fact or matter.

"Effective Date" has the meaning set forth in the Preamble to this Agreement.

"Encumbrance" means any charge, claim, community property interest, condition, easement, covenant, contract, commitment, warrants, demand, encumbrance, equitable interest, lien, mortgage, option, purchase right, pledge, security interest, right of first refusal, or other rights of third Persons or restriction of any kind, including without limitation any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"Equipment" means all fixtures, fixed assets (including all machinery, tools, vehicles, computers, computer equipment and computer-related hardware, including modems, hard drives, cables, file servers and internet servers (whether maintained by Debtor or a third Person on behalf of Debtor), facsimile servers, scanners, color printers, laser printers and networks, software and furniture), databases, point of sale ("POS") systems, disposal systems, artwork, racks, stands, displays, counters, desks, chairs, tables, dispensers, and other furniture and furnishings, parts, spare parts, small ware, and all other equipment, whether titled or untitled (including copiers, fax machines, telephone lines and numbers, other telecommunication equipment and serialized equipment), and miscellaneous office and store supplies and other

- 15 -

items of tangible personal property owned or used by Debtor in the conduct of the Business.  As used herein, Equipment does not include any tangible property held by Debtor pursuant to a Personal Property Lease where Buyer does not assume at the Closing the Personal Property Lease relating to such property.

"Excluded Asset(s)" has the meaning set forth in Section 1.3.

"Excluded Contract" means any Debtor's Contract that is designated by Buyer or Debtor as an Excluded Contract under, or becomes an Excluded Contract by operation of Section 1.4.

"Files and Records" has the meaning set forth in Section 1.2(f).

"GAAP" means United States generally accepted accounting principles.

"Governmental Body" means any federal, state, local, municipal, foreign, or other governmental or quasi-governmental authority, including without limitation any administrative, executive, judicial, legislative, regulatory or taxing authority of any nature of any jurisdiction (including without limitation, any governmental agency, branch, department, official, or entity and any court or other tribunal).

"Immediately Available Funds" means a confirmed Federal Reserve wire transfer of funds.

"Intellectual Property" means all intellectual property rights throughout the world, including, without limitation, all United States, international and foreign (a) patents, patent rights, patent applications, patent disclosures and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, improvements and extensions thereof; (b) trademarks, service marks, trade names, trade dress, fictitious business names, logos, slogans, domain names, and registrations and applications for registration thereof, together with all goodwill appurtenant thereto; (c) copyrights, copyrightable works and registrations and applications for registration thereof; (d) mask works and registrations and applications for registration thereof; (e) computer software programs and applications in both source and object code forms and related documentation; (f) sui generis database rights and other data necessary to operate the technology, (g) trade secrets, know-how and confidential information, whether or not patentable and whether or not reduced to practice, including, without limitation, to the extent not publicly known or available: ideas, concepts, inventions, formulae, compositions, methods, processes, techniques, data, machines, devices, research and development information, designs, drawings, specifications, compounds, prototypes, programs, algorithms and software, (h) all other proprietary rights relating to any of the foregoing (including, without limitation, associated goodwill and remedies against infringements thereof and rights of protection of an interest therein under the Laws of all jurisdictions); and (i) all copies and tangible embodiments thereof.

"Inventory" means all goods, products, and supplies sold or used in the sale of any goods or products and all other inventory owned and held by Debtor or used or consumed in connection with the Business, whether finished inventory, unfinished inventory, raw materials or work-in-process inventory, wherever located, and whether on hand, on order, in transit, or held by others on a consignment basis.

"Leases" has the meaning set forth in Section 1.2(a).

- 16 -

15932879

"Legal Requirement" means any federal, state, local, municipal, foreign, international, multinational, or other statute, law, Order, constitution, rule, regulation, ordinance, principle of common law, treaty or other requirement of any Governmental Body.

"Liabilities" means any liabilities of any kind whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, due or to become due, and whether or not reflected or required by GAAP to be reflected on the financial statements of Debtor.

"Material Adverse Change" means (i) a reduction in service for all Assumed Contracts designated for assignment to Buyer of greater than $128,500 for any month between the Effective Date and the Closing Date or (ii) the Debtor fails to properly fulfill its obligations prior to Closing to customers whose Assumed Contracts collectively comprise 50% or more of the Debtor's monthly recurring revenue (not including delays or issues with quality control within the range of normal activity).

"MRR Component" has the meaning set forth in Section 1.5(a).

"Notice of Successful Bidder and Assumed Contracts" has the meaning set forth in Section 1.4(a).

"November Revenue Amount" has the meaning set forth in Section 1.5(c).

"Order" means any award, decision, injunction, judgment, order, decree, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Body or by any arbitrator.

"Outside Date" means November 15, 2017.

"Person" means any individual, corporation, general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, or other entity or Governmental Body.

"Personal Property Lease" means any Debtor's Contract for the lease or license of Equipment or other personal property, tangible or intangible.

"Petition" has the meaning set forth in the Recitals hereto.

"Proceeding" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any court or other Governmental Body or referee, trustee, arbitrator or mediator.

"Professional Fees" means the aggregate fees and costs incurred and to be incurred through the Closing Date by the Buyer's Professionals.

"Professionals" means, collectively, the Buyer's Professionals including attorneys, tax professionals, and accountants for the Buyer.

- 17 -

"Purchased Asset(s)" has the meaning set forth in Section 1.2.

"Purchase Price" has the meaning set forth in Section 1.5.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the sale of the Purchased Assets in accordance with the terms and conditions of this Agreement.

"Sale Motion" has the meaning set forth in Section 8.3(a).

"Sale Order" has the meaning set forth in Section 8.3(a).

"Schedules" means the Schedules attached to this Agreement.

"Successful Bidder" has the meaning set forth in the Bid Procedures Order.

"Taxes" means liability for state and local real and personal property and sales taxes, water and sewer use charges, special assessments and tax abatements assessed on or with respect to the Purchased Assets payable with respect to the tax year in which the Closing Date falls.

"Tax Returns" means all federal, state, local and foreign Tax returns, reports or statements (including information returns) required to be filed.

"Transaction Documents" means this Agreement, and all other contracts, documents, agreements, instruments and certificates contemplated hereunder to be delivered by any party hereto at or prior to the Closing.

"Transfer Taxes" means all transfer, documentary, sales, use, stamp, registration and other such federal, state and local taxes and fees (including any penalties, interest, additions to tax and costs and expenses relating to such taxes, but excluding any transfer gains taxes), whether for real or personal property, incurred in connection with the consummation and performance of the transactions contemplated hereby.

## ARTICLE X

## MISCELLANEOUS

10.1   Bid Protection/Break-Up Fee. Recognizing Buyer's expenditure of time, energy and resources, Debtor has agreed to provide certain bidding protections to Buyer. Specifically, Debtor has determined that the Agreement will further the goals of the Bidding Procedures by setting a floor that all other possible bidders must exceed. As a result, Debtor has agreed that in the event Debtor breaches the terms of this Agreement or enters into another transaction for the sale of the Purchased Assets or any portion thereof with a Successful Bidder other than Buyer, Debtor will (i) pay to Buyer a Break-Up Fee in the amount of 3% of the Purchase Price, and (ii) reimburse Buyer for its reasonable Professional Expenses, provided that such reimbursement shall not exceed the amount of $50,000.00.

10.2   No Third-Party Beneficiaries. This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns.

- 18 -

10.3   <u>Notices</u>.  All notices, and other such communications shall be in writing and shall be delivered in person, by nationally recognized overnight delivery service (e.g., FedEx or UPS), by certified or registered mail, return receipt requested, or by confirmed email or facsimile transmission, addressed as set forth below. Notices shall be deemed to be given or received on the date of actual receipt (or refusal of delivery) at the applicable below-stated address or at such other address as a party may direct from time to time upon written notice to the other party at least five (5) days prior to the proposed change of address:

|  |  |
|---|---|
| Debtor: | Ajubeo, LLC<br>1470 Walnut Street, Suite 400<br>Boulder, Colorado 80302<br>Attention:  Alex Smith<br>Email:  asmith@alliancemgmt.com |
| With a copy to: | Brownstein Hyatt Farber Schreck, LLP<br>Joshua M. Hantman<br>410 Seventeenth Street, Suite 2200<br>Denver, Colorado 80202<br>Email: JHantman@BHFS.com |
| Buyer: | Green House Data<br>340 Progress Circle<br>Cheyenne, Wyoming 82007<br>Attention: T. Shawn Mills<br>Email:  smills@greenhousedata.com |
|  | and |
| With a copy to: | Fairfield and Woods, PC<br>1801 California Street<br>26th Floor<br>Denver, CO  80202<br>Attn:  Matthew S. Rork<br>E-Mail: mrork@fwlaw.com |

or to such changed address as may be fixed by notice.   All such notices and other communications shall, except as otherwise expressly herein provided, be effective when received by the party to whom properly addressed, in the case of the Debtor, the written receipt by any employee of the Debtor constituting sufficient evidence of such receipt.

10.4   <u>Further Assurances</u>.  The parties agree (a) to furnish upon request to each other such further information, (b) to execute and deliver to each other such other documents, and (c) to do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the transactions contemplated by this Agreement.

10.5   <u>Amendments and Waivers</u>.  No amendment or waiver of any provision of this Agreement shall be valid unless in writing and signed by party to be charged with such amendment or waiver.  No waiver by any party of any default, misrepresentation, or breach of

- 19 -

warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

10.6    Entire Agreement.

(a)    This Agreement supersedes all prior agreements between the parties with respect to its subject matter and constitutes (together with the other Transaction Documents and any other documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter.  The exhibits and schedules identified in and attached to this Agreement are incorporated herein by reference and shall be deemed as fully a part hereof as if set forth herein in full.

(b)    In the event of any inconsistency between the statements in the body of this Agreement and those in the exhibits and schedules (other than an exception expressly set forth as such in the Disclosure Schedule with respect to a specifically identified representation or warranty), the statements in the body of this Agreement will control.

10.7    Assignments, Successors and No Third-Party Rights.  Except as set forth in the next sentence, neither party may assign any of its rights under this Agreement without the prior consent of the other parties.  Each Buyer may assign this Agreement to an affiliate or subsidiary at Closing.  This Agreement will apply to, be binding in all respects upon, and inure to the benefit of the successors and permitted assigns of the parties.

10.8    Severability.    Any term of this Agreement which would be invalid or unenforceable as written shall be deemed limited in scope and/or duration to the extent necessary to render it enforceable.   The determination of any court that any provision is invalid or unenforceable shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity of the offending term or provision in any other situation or in any other jurisdiction.

10.9    Headings.   The captions, titles and headings used in this Agreement are for convenience of reference only, shall not be deemed part of this Agreement and shall not affect its construction or interpretation.   Except where otherwise expressly provided, all references to "Sections" or "Articles" refer to the corresponding Sections or Articles in the body of this Agreement.  All words used in this Agreement will be construed to be of such gender or number as the circumstances require.  Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

10.10    Construction.    The parties have participated jointly in the drafting of this Agreement, and each party was represented by counsel in the negotiation of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

10.11    Governing Law.  This Agreement will be governed by the laws of the State of Colorado without giving effect to its conflicts of laws principles.

- 20 -

15932879

10.12   Counterparts; Facsimile.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.   Original signatures hereto and to other Transaction Documents may be delivered by facsimile which shall be deemed originals.

10.13   Termination by Buyer.   If the Closing does not occur on or before the Outside Date, Buyer may terminate this Agreement in their sole discretion by written notice to Debtor and thereafter, this Agreement will be of no further force or effect provided, however, that Buyer shall still be entitled to reimbursement of its Professional Fees from Debtor.

10.14   Transfer of Electronic Media.   Buyer shall have up to sixty (60) days from the date of Closing to transfer any data or electronic media ("**Electronic Media**") for any of the Assumed Contracts from the Debtor's Equipment to the Buyer's Equipment.   Debtor shall cooperate fully in all respects to assist Buyer in transferring this Electronic Media to Buyer's Equipment including, but not limited to, providing reasonable access to any servers maintained by Debtor.   Debtor shall set aside and hold in escrow funds received from the Purchase Price paid by Buyer funds sufficient to pay any Equipment leases maintained by Debtor upon which Electronic Media for the Assumed Contracts resides and shall pay all Debtor Equipment lease payments as they become due during the 60-day transfer period.   In the event that as of the Closing Date Buyer has not negotiated a new lease with the Debtor's landlord, Buyer shall be responsible to pay all utility bills, real property leases, and insurance necessary for accessing the Debtor Equipment during the 60-day period; *provided*, *however*, that if the Closing Date occurs after October 31, 2017, then Buyer's obligation to pay such utility bills, real property leases, and insurance shall be prorated based on the number of days that have elapsed in the month in which the Closing Date occurs.   In the event that Debtor fails to comply with this provision in any material respect, Buyer may terminate this Agreement and receive a full refund of the Purchase Price.

10.15   In the event the Bankruptcy Court fails to approve any DIP Loan to Debtor on terms that are acceptable to Buyer, in Buyer's sole discretion, Buyer shall have the option to terminate this Agreement, and upon such termination this Agreement shall be of no legal force or effect.

*[Signature page follows]*

- 21 -

15932879

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

**DEBTOR:**

**AJUBEO LLC**

By:_____
Alex Smith – Chief Restructuring Officer

**BUYER:**

**GREEN HOUSE DATA, INC.**

By:_____
T. Shawn Mills -- President

15932879

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

**DEBTOR:**

**AJUBEO LLC**

By:_____
      Alex Smith – Chief Restructuring Officer

**BUYER:**

**GREEN HOUSE DATA, INC.**

By: _____
      T. Shawn Mills -- President

15932879

## Schedule 1.2(a)  - Assumed Contracts

## Vendor Contracts

Cogent

Century Link

Level 3 Communications

Zayo

LogicMonitor

Arin

Godaddy

Google

PagerDuty

Ring Central

## Customer Contracts

| | | |
|---|---|---|
| A Precious Child | Kasidie LLC | Solibo |
| Acosta Sales & Marketing | Kings Seafood Company | Summit Partners - JS Products |
| Advoda Communications | Magnelab | Summit Partners - Selling Simplified |
| Aqua-Hot Heating Systems | Mammoth Universal | Sweeney Conrad |
| BCM One | MasterControl | The Spectranetics Corporation |
| Binswanger Enterprises LLC | Merrill Corporation | Transbeam, Inc |
| Black Knight Financial Technology Solutions, LLC / Motivity | MidFirst Bank | US Transport and Logistics |
| Bohler Engineering | Motive Retails | |
| Bolttech Mannings, Inc. | Motocol LLC | |
| Byteworks | Mytech Partners | |
| CapGemini | Netlink | |
| Capstone Inc. | Oncology Convergence, Inc. (OCI) | |
| Chelsea Technologies | Onyx M.D. | |
| CNIC | Physician Reimbursement Systems | |
| Compassion and Choices | Productive Data Commercial Solutions (PDS) | |
| CPP Associates | PSIA | |
| Equifax | Quarri Technologies, Inc. | |
| FluentStream Technologies | Revolution Foods | |
| GoWest IT | SAF Networks | |
| GreyHeller | SeeGee | |
| Hyder Construction | Sigma Blood | |
| Innovo LLC | SLI Global Solutions | |

**Schedule 1.2 (b) – Acquired Assets**

Debtor transfers to Buyer all Debtor's tangible personal property used in the business including but not limited to the following: laptop computers, desktop computers, networking, storage, computing equipment, software, shelving, printers, office equipment, reference materials, office supplies, etc.

The equipment associated with all Hewlett-Packard Financial Services Company leases including leases 5290216415000001, 5290216415000002, 5290216415000003, 5290216415000004, 5290216415000005, 5290216415000006, 5290216415000007, 5290216415000008.

The equipment associated with the VAR Resources, Inc. Master Lease Agreement 1098101.

**EXHIBIT A**

BID PROCEDURES ORDER

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF COLORADO**

| | |
|---|---|
| In re: | Case No. 17-17924-JGR |
| AJUBEO LLC,<br>EIN: 45-2467444, | Chapter 11 |
| Debtor. | |

**ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (B) APPROVING STALKING HORSE BID PROTECTIONS, (C) APPROVING PROCEDURES FOR THE ASSUMPTION, ASSIGNMENT, AND SALE OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) APPROVING THE FORM AND MANNER OF NOTICE OF THE AUCTION AND SALE HEARING AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (E) SCHEDULING AN AUCTION AND SALE HEARING, AND (F) GRANTING RELATED RELIEF**

This matter having come before this Court on the motion of Ajubeo LLC (the "**Debtor**")[1]

for Orders Pursuant to §§ 105(a), 363(b), and 365 of Chapter 11 of Title 11 of the United States

Code, 11 U.S.C. §§ 101, *et. seq.* (the "**Bankruptcy Code**"); Rules 2002, 6004, 6006, and 9014

of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); and Rule 6004-1 of

the Local Rules for the United States Bankruptcy Court of the District of Colorado (the "**Local**

**Rules**") (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtor's

Assets, (B) Approving Stalking Horse Bid Protections, (C) Approving Procedures for the

Assumption, Assignment, and Sale of Executory Contracts and Unexpired Leases,

(D) Approving the Form and Manner of Notice of the Auction and Sale Hearing and the

Assumption and Assignment of Certain Executory Contracts and Unexpired Leases,

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion or related Asset Purchase Agreement (the "**APA**") or the Bidding Procedures, as appropriate.

1

15931239

(E) Scheduling an Auction and Sale Hearing, and (F) Granting Related Relief; and

(II)(A) Authorizing and Approving the Sale of Substantially All Assets and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (B) Waiving the 14-Day Stay of Fed. R. Bankr. P. 6004(h) and 6006(d) (the "**Sale Motion**"); and the Debtor, by the Sale Motion, having requested the entry of an order (this "**Bidding Procedures Order**")

(a) approving bidding procedures in connection with the Sale (the "**Bidding Procedures**");

(b) approving the form and manner of (i) the notice that will be filed with this Court and served on all creditors and other parties in interest regarding the Auction, the Sale and the Sale Hearing as set out herein (the "**Notice of Sale**") and (ii) the notice (the "**Assignment Notice**"), which shall be filed and served on all non-debtor counterparties to any executory contract or unexpired lease (the "**Contracts**") of the Debtor, of the potential assumption and assignment (the "**Assumption and Assignment**") of such Contracts to the Successful Bidder in connection with the Sale, and the cure amounts in respect thereof; and (c) scheduling a hearing at which this Court will consider approval of the Sale pursuant to and as described in the APA (or any other Successful Bid in accordance with the Bidding Procedures) (the "**Sale Hearing**"); and the Debtor having determined that the Bidding Procedures, and the other relief related thereto requested in the Sale Motion will induce competitive bidding for the Debtor's assets and will maximize the value of the Debtor's estate; and this Court having reviewed and considered (i) the Sale Motion and the exhibits thereto; (ii) arguments of counsel in support of the entry of this Bidding Procedures Order; and (iii) the opposition thereto, if any, at a hearing for such purpose (the "**Bidding Procedures Hearing**"); and it appearing that the relief requested in the Sale Motion is necessary and in the best interests of the Debtor, its estate, its creditors, and other

2

parties-in-interest therein; and it appearing that due and proper notice of the Sale Motion has

been given as set forth in the Sale Motion and that no other or further notice need be given; and

reasonable opportunity to object or be heard regarding the relief granted herein having been

afforded to all interested persons and entities, including but not limited to the Notice Parties (as

defined below); and upon the record of the Bidding Procedures Hearing; and after due

deliberation thereon; and good cause appearing therefore, it is hereby

**FOUND AND DETERMINED THAT:**[2]

A.     This Court has jurisdiction over this matter and over the property of the Debtor

and its bankruptcy estate pursuant to 28 U.S.C. §§ 1334 and 157(a).  This is a core proceeding

pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A), (N), and (O). Venue is proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     As evidenced by the certificates of service previously filed with this Court, and

based on the representations of counsel at the Bidding Procedures Hearing, (i) proper, timely,

adequate, and sufficient notice of the Bidding Procedures, the form and manner of providing the

Notice of Sale, the Assignment Notice, the Bidding Procedures Hearing and the other relief

related thereto requested in the Sale Motion has been provided in accordance with sections

102(1), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, and

Local Rule 6004-1; (ii) such notice was good and sufficient and appropriate under the particular

circumstances; and (iii) no other or further notice of Bidding Procedures, the form and manner of

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052.

15931239

the Notice of Sale and the Assignment Notice, the Bidding Procedures Hearing and the other relief related thereto requested in the Sale Motion is necessary or shall be required.

C.     Reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested in the Sale Motion has been afforded to all interested persons and entities, including, without limitation: (i) all entities reasonably known to have expressed an interest in a transaction with respect to the Debtor or the Purchased Assets; (ii) any entities known to have asserted any Encumbrance in or upon the Purchased Assets; (iii) each of the non-debtor counterparties to the Contracts (each a "**Counterparty**"); (iv) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (v) all parties to the APA (or any other Successful Bid in accordance with the Bidding Procedures) and all related agreements; (vi) the Office of the United States Trustee; (vii) the Internal Revenue Service; (viii) all entities that have requested notice in accordance with Bankruptcy Rule 2002; and (ix) all other known creditors of the Debtor.

D.     The Debtor has articulated good and sufficient reasons for approving (i) the Bidding Procedures; (ii) the form and manner of the Notice of Sale; (iii) the form and manner of providing the Assignment Notice; and, in connection therewith, (iv) the procedures described below for the determination of the amounts necessary to cure defaults under the Assumed Contracts (the "**Cure Costs**") and to address any other disputes in connection with the Assumption and Assignment pursuant to section 365 of the Bankruptcy Code; and (v) the other relief related thereto requested in the Sale Motion.

E.     The Debtor has articulated good and sufficient reasons for scheduling the Sale Hearing as set forth herein.

4

15931239

F.      The Debtor's notice of the Auction, the Sale, the Sale Hearing and the Assumption and Assignment as described herein is appropriate and reasonably calculated to provide interested parties with timely and proper notice, and no other or further notice is required.

G.      The Bid Protections (as defined in the Sale Motion) are reasonable, necessary, and appropriate because they were necessary to induce the Stalking Horse Bidder to serve as stalking horse, which sets a baseline for an orderly auction and sale process;

H.      The Minimum Overbid and Bidding Increments are beneficial to the Debtor's estate and creditors because they will ensure a competitive and efficient bidding process and will enhance the Debtor's ability to maximize the value of its assets for the benefit of its creditors and other parties-in-interest therein.  The terms and conditions of the Minimum Overbid and Bidding Increments are fair and reasonable and are the product of extensive good faith negotiations between the Debtor and the Stalking Horse Bidder.  The Debtor has demonstrated a sound business justification for the Minimum Overbid and Bidding Increments.

(i)      *Minimum Overbid*. The Minimum Overbid will benefit the Debtor's estate because it will function as an effective tool to identify only highly motivated bidders.  A Minimum Overbid on the terms described in the Bidding Procedures will ensure both that the competing bidders are serious and that their overbids are meaningfully better for the Debtor (considering the added cost of facilitating further diligence to new bidders under time and publicity constraints).  The Minimum Overbid will ensure that the Auction will generate a material benefit to the Debtor's estate as a whole.

15931239

(ii)     *Bidding Increments.* Similarly, the Bidding Increments, on the terms described in the Bidding Procedures, will effectively filter the pool of prospective bidders and ensure that competing bidders are seriously motivated to purchase the Purchased Assets.  Thus, the Bidding Increments also provide a benefit to the Debtor's estate.

I.       The Bidding Procedures are fair, reasonable and appropriate and are designed to maximize the proceeds from the Sale. The Bidding Procedures were negotiated in good faith and at arm's length between the Debtor and the Stalking Horse Bidder. Under the circumstances, and particularly in light of the extensive prior marketing of the Purchased Assets, the Bidding Procedures constitute a reasonable, sufficient, adequate, and proper means to provide potential competing bidders with an opportunity to submit and pursue higher and better offers for the Purchased Assets.

J.       Time is of the essence with respect to the entry of this Bidding Procedures Order.

K.       Entry of this Bidding Procedures Order is in the best interests of the Debtor and its estate, creditors and other parties-in-interest.

L.       The Sale Motion and this Bidding Procedures Order comply with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.       The procedures set forth in the Sale Motion are APPROVED to the extent set forth herein.

2.       Any objections to entry of this Bidding Procedures Order or the relief granted herein that have not been withdrawn or waived and all reservations of rights included in such objections, are overruled in all respects on the merits.

6

15931239

*Bidding Procedures*

3.          The Bidding Procedures set forth in Exhibit A hereto and the Assumption and

Assignment Procedures (as defined below) are hereby **APPROVED** and the Bidding Procedures

shall be fully incorporated into this Bidding Procedures Order.  The Bidding Procedures and the

Assumption and Assignment Procedures shall be used for (i) marketing, negotiating and

consummating the Sale of the Purchased Assets free and clear of all Encumbrances in

accordance with section 363 of the Bankruptcy Code, and (ii) the Assumption and Assignment in

accordance with section 365 of the Bankruptcy Code and shall govern all proceedings relating to

the Sale, the APA, and any subsequent bids for the Purchased Assets in this Bankruptcy Case.

The Debtor is hereby authorized and directed to act in accordance with the Bidding Procedures

and the Assumption and the Assignment Procedures.

4.          The failure specifically to include or reference any particular provision of the

Bidding Procedures in this Bidding Procedures Order shall not diminish or impair the

effectiveness of such provision, it being the intent of this Court that the Bidding Procedures be

authorized and approved in their entirety.

5.          To constitute a "Qualified Bid," any offer by any person wishing to submit a

higher or better offer for the Purchased Assets (or a portion thereof) must be made in accordance

with the terms of the Bidding Procedures; *provided* that the APA is and is hereby deemed to be a

Qualified Bid.

6.          No party, other than the Stalking Horse Bidder, submitting any offer to purchase

the Purchased Assets (or a portion thereof) or having made a Qualified Bid of any nature:

(a) may request as part of any such offer any expense reimbursement, break-up fee, or

7

15931239

termination payment or any other similar fee or payment in connection with the Sale process contemplated by these Bidding Procedures; or (b) shall be entitled to any of the foregoing payments for having tendered any such offer to purchase, or for agreeing to purchase, the Purchased Assets (or a portion thereof).

7.      To participate at the Auction, an Overbidder must submit its bid in a form acceptable to the Debtor (with copies to certain professionals as explained in the Bidding Procedures) on or before October 23, 2017 at 5:00 p.m. (prevailing Mountain Time) (the "**Bid Deadline**"), as further described in the Bidding Procedures.

8.      The Auction, if any, shall be conducted at the offices of Brownstein Hyatt Farber Schreck LLP, 410 17th Street, Suite 2200, Denver, Colorado 80202, on October 27, 2017 at 9:00 a.m. (prevailing Mountain Time).

*Notice, Objection Deadline to Sale Order and Sale Hearing*

9.      Notice of the Bidding Procedures, the Auction, the Sale, the Sale Hearing, the Assumption and Assignment and the relief requested in the Sale Motion with respect thereto shall be good and sufficient notice, and no other or further notice shall be required if given as follows:

(a)      within two (2) business days after entry of this Bidding Procedures Order, the Notice of Sale substantially in the form attached to the Sale Motion as Exhibit 2, along with this Bidding Procedures Order and the Bidding Procedures, shall be served by first-class mail upon (i) all entities known to the Debtor to have expressed an interest in the Purchased Assets; (ii) all entities known to the Debtor to have asserted any Encumbrance in or upon the Purchased Assets (or a portion thereof); (iii) all federal, state and local regulatory or taxing authorities or

8

15931239

governmental authorities that have a reasonably known interest in the relief requested by the Sale Motion (including the Internal Revenue Service); (iv) the Office of the United States Trustee for the District of Colorado; (v)  all known creditors and other parties-in-interest of the Debtor; and (vi) all entities requesting notice pursuant to Bankruptcy Rule 2002; and

(b)     within two (2) business days after entry of this Bidding Procedures Order, the Assignment Notice, substantially in the form attached to the Sale Motion as Exhibit 3, shall be served by first-class mail upon each counterparty to the potential Assumed Contracts.

13.     The Sale Hearing will take place on October 30, 2017 at [•] (prevailing Mountain Time) in the courtroom of the Honorable Joseph G. Rosania in the United States Bankruptcy Court for the District of Colorado, 721 19th St., Denver, Colorado 80202.

14.     The Sale Hearing to consider approval of the Sale to the Successful Bidder (or to approve the APA if the Successful Bid is by the Stalking Horse Bidder) may be adjourned from time to time without further notice to creditors or parties-in-interest other than by announcement of the adjournment in open Court or on this Court's calendar on the date scheduled for the Sale Hearing or any adjourned date.

15.     Objections to the relief sought in the Sale Order shall be in writing, filed and served so as to be actually received by (i) the Debtor's Chief Restructuring Officer, Alliance Management, 1400 Sixteenth Street, Suite 400, Denver, CO 80202, Attn: Alex Smith; (ii) counsel for the Debtor, Brownstein Hyatt Farber Schreck LLP, 410 17th Street, Suite 2200, Denver CO 80202, Attn: Joshua M. Hantman; (iii) counsel for the Stalking Horse Bidder, Fairfield and Woods, P.C., 1801 California Street, Suite 2600, Denver, CO 80202, Attn: Matthew S. Rork; (iv) counsel for Silicon Valley Bank, Riemer Braunstein, LLP, Three Center

9

Plaza, Suite 600, Boston, MA 02108, Attn: Alexander Rheaume; and (v) the Office of the United

States Trustee, Byron G. Rogers Federal Building, 1961 Stout St., Ste. 12-200, Denver, CO

80294 (collectively, the "**Notice Parties**") by [•], 2017 at [•] (prevailing Mountain Time).

<em><u>Assumption and Assignment Procedures</u></em>

16.     The following procedures (the "**Assumption and Assignment Procedures**")

shall govern the Assumption and Assignment:

(a)     The Debtor shall, within two (2) business days after the date of this

Bidding Procedures Order, serve on each Counterparty an Assignment Notice specifying the

Cure Cost and the potential for the Debtor to assume and assign each of the Contracts to the

Stalking Horse Bidder or other Successful Bidder.  If the Debtor identifies additional executory

contracts or unexpired leases that might be assumed by the Debtor and assigned to the Stalking

Horse Bidder (or other Successful Bidder) not set forth in the original Assignment Notice, the

Debtor shall promptly send a supplemental notice (a "**Supplemental Assignment Notice**") to the

applicable counterparties, and such additional contracts or leases shall be deemed Contracts for

purposes of this Order.

(b)     Objections, if any, to the proposed Cure Costs, or to the proposed

Assumption and Assignment, including, but not limited to, objections relating to adequate

assurance of future performance by the Stalking Horse Bidder or objections relating to whether

applicable law excuses the Counterparty from accepting performance by, or rendering

performance to, the Successful Bidder for purposes of section 365(c)(l) of the Bankruptcy Code,

must be in writing and filed with this Court and served on the Notice Parties so as to be received

no later than five (5) business days prior to the Bid Deadline (the "**Designation and Cure**

10

15931239

**Objection Deadline**"); provided, however, that in the event the Successful Bidder is a bidder other than the Stalking Horse Bidder (which, if applicable, will be set forth in the Notice of Successful Bidder and Assumed Contracts), objections relating to adequate assurance of future performance may be raised at any time prior to or during the Sale Hearing; provided further, however, that for any counterparty that receives a Supplemental Assignment Notice, the Designation and Cure Objection Deadline shall be the earlier of (i) ten (10) days after the mailing of the Supplemental Assignment Notice, or (ii) two (2) business days prior to the Sale Hearing.

(c)     Within twenty-four (24) hours after the conclusion of the Auction, the Debtor shall file a notice (the "**Notice of Successful Bidder and Assumed Contracts**"), which shall state (i) the identity of the Successful Bidder, and (ii) the Contracts that the Debtor proposes to assume and assign to the Successful Bidder (the "**Assumed Contracts**").

(d)     Where a Counterparty files an objection meeting the requirements set forth herein, objecting to the assumption by the Debtor and assignment to the Successful Bidder of such Contract (the "**Disputed Designation**") and/or asserting a cure amount higher than the proposed Cure Costs listed on the Assignment Notice (the "**Disputed Cure Costs**"), the Debtor, the Stalking Horse Bidder, or the other Successful Bidder (as the case may be), and the Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention. If the Debtor, the Counterparty, and the Stalking Horse Bidder (or the other Successful Bidder, as the case may be), determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Disputed Designation and/or the amount to be paid under section 365 of the Bankruptcy Code with respect to the Disputed Cure Costs will be determined by this Court at the Sale Hearing.  If this Court

11

determines at the Sale Hearing that the Assumed Contract will not be assumed and assigned, then such executory contract shall no longer be considered an Assumed Contract, provided, however, that after such determination is made by this Court, the Debtor may propose a new Cure Cost in accordance with the procedures set forth herein, including providing the applicable Counterparty with the Assignment Notice setting forth the redesignation and proposed new Cure Cost of the Assumed Contract.  Notwithstanding the foregoing, the Debtor, in consultation with the Stalking Horse Bidder, or the other Successful Bidder (as the case may be), may at any time withdraw its application to this Court for authorization to assume and assign any Assumed Contract that is the subject of a Disputed Designation.

(e)    Other than with respect to the ability to raise objections relating to adequate assurance of future performance of a Successful Bidder other than the Stalking Horse Bidder at any time prior to or during the Sale Hearing, any Counterparty to a Contract who fails to timely file an objection to the proposed Cure Costs or the proposed assumption and assignment of a Contract by the Designation and Cure Objection Deadline is deemed to have consented to such Cure Costs and the assumption and assignment of such Contract, and such party shall be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts against the Debtor, its estate, or the Stalking Horse Bidder (or the other Successful Bidder, as the case may be).

(f)    If the Counterparty to a Contract fails to timely object to the assumption and assignment of a Contract or the proposed Cure Cost relating thereto by the Designation and Cure Objection Deadline, or upon the resolution of any timely objection by agreement of the parties or order of this Court approving an assumption and assignment, such Contract may be

12

15931239

assumed by the Debtor and assigned to the Successful Bidder, and the proposed Cure Cost related to such Contract shall be established and approved in all respects, subject to the conditions set forth directly below.

(g)     The Debtor's decision to assume and assign the Assumed Contracts is subject to Court approval and consummation of the Sale.  Accordingly, subject to the satisfaction of conditions in connection with the Sale, the Debtor shall be deemed to have assumed and assigned the Assumed Contracts as of the date of and effective only upon the Closing Date (as defined in the APA (or any other Successful Bid in accordance with the Bidding Procedures)), and absent such closing, each of the Assumed Contracts shall neither be deemed assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtor under the Bankruptcy Code.  Additionally, inclusion of any document on the list of Contracts in the Assignment Notice shall not constitute or be deemed to be a determination or admission by the Debtor or the Stalking Horse Bidder (or the other Successful Bidder, as the case may be) that such document is, in fact, an executory contract within the meaning of the Bankruptcy Code, all rights with respect thereto being expressly reserved.

(h)     Except as may otherwise be agreed to by the parties to an Assumed Contract, the defaults under the Assumed Contracts that must be cured in accordance with section 365(b) of the Bankruptcy Code shall be cured as follows: the Successful Bidder shall pay all Cure Costs relating to an assumed executory contract within ten days after the later of (i) the Closing Date; (ii) the date on which such Assumed Contract is deemed assumed and assigned; or (iii) the date on which the Successful Bidder and contract counterparty otherwise agree to in writing.

13

15931239

(i)     Following the Bid Deadline, no Proposed Assumed Contract may be excluded by the Stalking Horse Bidder or Successful Bidder, as applicable, and all Proposed Assumed Contracts shall be listed as Assumed Contracts in the Notice of Successful Bidder and Assumed Contracts.

(j)     Any Contract that is not an Assumed Contract shall be deemed rejected as of the Closing Date; *provided*, *however*, that if any Contract to which the Counterparty is Data Sales Co., Inc., or Farnam Street Financial, Inc. is not an Assumed Contract, then such Contract shall be deemed rejected as of the date that is sixty (60) days after the Closing Date.

17.     Notwithstanding Bankruptcy Rules 6004, 6006 or otherwise, this Bidding Procedures Order shall be effective and enforceable immediately upon entry.

18.     This Court shall retain jurisdiction over any matter or dispute arising from or related to implementing this Bidding Procedures Order.

Dated: _____, 2017

BY THE COURT:

_____
The Hon. Joseph G. Rosania, Jr.
United States Bankruptcy Judge

14

15931239

## EXHIBIT A

**Bidding Procedures**

15931239

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF COLORADO**

| | |
|---|---|
| In re: | |
| | Case No. 17-17924-JGR |
| AJUBEO LLC, | |
| EIN: 45-2467444, | Chapter 11 |
| | |
| Debtor. | |

## BIDDING PROCEDURES

By the motion dated September 5, 2017 (the "**Motion**"),[1] Ajubeo LLC (the "**Debtor**"),

the debtor-in-possession in the above-captioned case under Chapter 11 of the United States

Bankruptcy Code (the "**Bankruptcy Case**"), sought approval of, among other things, the

procedures pursuant to which it will determine the highest or otherwise best offer for the sale

(the "**Sale**") of substantially all of the Debtor's assets (the "**Purchased Assets**") pursuant to the

terms of, and substantially in the form of, that certain Asset Purchase Agreement by and between

the Debtor and Green House Data, Inc. ("**Stalking Horse Bidder**"), dated as of September 5,

2017 (the "**APA**") attached to the Motion (as the same may be amended).

On [•], 2017, the United States Bankruptcy Court for the District of Colorado (the

"**Bankruptcy Court**") entered an order (the "**Bidding Procedures Order**"), which, among

other things, authorized, on a final basis, the Debtor to determine the highest or otherwise best

---

[1] The "Motion" referred to herein is the Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtor's Assets, (B) Approving Stalking Horse Bid Protections, (C) Approving Procedures for the Assumption, Assignment, and Sale of Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of Notice of the Auction and Sale Hearing and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (E) Scheduling an Auction and Sale Hearing, and (F) Granting Related Relief; and (II)(A) Authorizing and Approving the Sale of Substantially All Assets and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (B) Waiving the 14-Day Stay of Fed. R. Bankr. P. 6004(h) and 6006(d).  Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Motion.

15931239

price for the Purchased Assets through the process and procedures set forth below (the "**Bidding Procedures**").

On October 30, 2017 at [•] (prevailing Mountain Time) (or such other date and time as may be designated), as further described below, in the Motion and in the Bidding Procedures Order, the Bankruptcy Court will conduct a hearing (the "**Sale Hearing**") at which the Debtor shall seek entry of an order (the "**Sale Order**") authorizing and approving the Sale of the Purchased Assets pursuant to the terms of the Successful Bid (as defined below).

1.      **Participation Requirements**

(a)      To be qualified to receive any confidential information from the Debtor, a potential bidder must submit to the Debtor, prior to the receipt of any such information, an executed confidentiality agreement which shall inure to the benefit of the Successful Bidder, in a form and substance acceptable to the Debtor and the Stalking Horse Bidder.  To be qualified (i) to submit an Initial Overbid, as that term is hereinafter defined, and (ii) to participate in the Auction, a potential bidder must submit to the Debtor before the Bid Deadline (defined below) current audited financial statements and the latest unaudited financial statements of the potential bidder or, if such potential bidder is an entity formed for the purpose of acquiring the Purchased Assets, current audited financial statements and the latest unaudited financial statements of the equity holders or sponsors of such potential bidder who will guarantee the obligations of such potential bidder, or such other form of financial disclosure and/or credit-quality support or enhancement, if any, that will allow the Debtor to make a reasonable determination as to such potential bidder's financial and other capabilities to consummate the Sale.

2

(b)     Based on the materials received by it, the Debtor shall determine whether any potential bidder that has timely submitted the materials referred to in Section 1(a) above qualifies to submit a bid (such qualifying potential bidder, an "**Overbidder**").

2.     **Bid Requirements**

(a)     To participate at the Auction, an Overbidder must submit the following to the Debtor before the Bid Deadline (as defined below):

      (i)     a proposed asset purchase agreement (the "**Competing Purchase Agreement**") executed by the Overbidder that (i) is on substantially the same terms and conditions as the APA along with a redlined, marked copy showing all changes between the Competing Purchase Agreement and the APA (the Debtor's counsel will provide a copy of the APA in Microsoft Word format to Overbidders); (ii) provides for a purchase price to be paid to the Debtor that exceeds the Purchase Price[2] (as defined in the APA) by at least fifty thousand dollars ($50,000) cash (such aggregate amount of the Purchase Price plus $50,000, the "**Minimum Overbid**"); (iii) contains a list of the Debtor's executory contracts and unexpired leases with respect to which the Overbidder seeks assignment from the Debtor (whether set forth in the Stalking Horse Bidder's APA or a Competing Purchase Agreement, the "**Proposed Assumed Contracts**"); (iv)  remains irrevocable until the earlier of the closing of a purchase of the Purchased Assets by the Successful Bidder and the Overbidder Outside Date (as defined below); (v) disclaims any right of the Overbidder to receive any transaction or breakup fee, expense reimbursement or similar fee or payment or to compensation under Bankruptcy Code Section 503(b) for making a substantial contribution; and (vi) contains a proposed closing date that is not later than November 15, 2017 or such later dates as may be agreed in writing by the Debtor and the Overbidder in their sole discretion (the "**Overbidder Outside Date**");

      (ii)     a cashier's check made payable to the order of the Debtor in the amount of $100,000 (the "**Overbidder's Deposit**"), which will be retained by the Debtor as a nonrefundable good faith deposit for application against the purchase price at the closing of the transaction or returned to the

---

[2] Pursuant to the terms of the APA, the Purchase Price is $1,945,798.00, subject to adjustment based on the Closing AR Amount and the November Revenue Amount, as set forth in the APA.

3

15931239

Overbidder or otherwise applied as set forth in these Bidding Procedures; and

(iii)     admissible evidence in the form of affidavits or declarations establishing that the Overbidder has the financial ability to pay the purchase price and provide adequate assurance of future performance under all contracts to be assigned to it.

(b)     A bid received from an Overbidder (and any bid submitted at the Auction by an Overbidder) that meets the requirements set forth above will be considered a "**Qualified Bid**" if, in the good faith opinion of the Debtor, after consulting with its financial and legal advisors and with its secured lender, Silicon Valley Bank, (i) such bid is determined not to be materially more burdensome or conditional than the terms of the APA and (ii) the Debtor reasonably believes that such bid would be consummated before the Overbidder Outside Date if selected as a Successful Bid (as defined below).  Each Overbidder will be notified within 24 hours of receipt of its bid by the Debtor whether such Overbidder's bid has been deemed a Qualified Bid.

(c)     Each bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Purchased Assets prior to making any bids; that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Purchased Assets, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures or, as to the Successful Bidder, the asset purchase agreement with such Successful Bidder.

4

15931239

(d)     The Stalking Horse Bidder, and any entity that submits a timely Qualified Bid accompanied by all items required to be submitted along therewith in accordance with these Bidding Procedures (an "**Initial Overbid**"), shall each be deemed a "**Qualified Overbidder**" and may bid for the Purchased Assets at the Auction.  Any entity (other than the Stalking Horse Bidder) that fails to submit a timely, conforming Initial Overbid, as set forth above, shall be disqualified from bidding for the Purchased Assets at the Auction.  The Debtor shall, promptly upon receipt of any Initial Overbid, provide copies of such Initial Overbid to the Stalking Horse Bidder and to counsel for Silicon Valley Bank.

3.      **Bid Deadline**

(a)     The deadline for submitting bids by an Overbidder shall be **October 23, 2017** at **5:00 p.m.** (prevailing Mountain Time) (the "**Bid Deadline**").

(b)     Before the Bid Deadline, an Overbidder that desires to make a bid shall deliver written copies of its bid via overnight mail and email to (i) counsel for the Debtor, Brownstein Hyatt Farber Schreck LLP, 410 17th Street, Suite 2200, Denver CO 80202, Attn: Joshua M. Hantman; jhantman@bhfs.com; and (ii) counsel for Silicon Valley Bank, Riemer Braunstein, LLP, Three Center Plaza, Suite 600, Boston, MA 02108, Attn: Alexander Rheaume; arheaume@riemerlaw.com.

4.      **Auction**

(a)     If no timely, conforming Initial Overbid is received, the Debtor shall not conduct an Auction and shall request at the Sale Hearing that the Court approve the APA, including the Sale of the Purchased Assets (including the assignment of the Assumed Contracts, if any) to the

5

Stalking Horse Bidder, and request that the Sale Order shall be immediately effective upon entry, notwithstanding Bankruptcy Rule 6004(h).

(b)    If one or more timely conforming Initial Overbids are received, the Debtor shall conduct an Auction of the Purchased Assets, in which the Stalking Horse Bidder and all other Qualified Overbidders may participate.  The Auction shall be conducted at the offices of Brownstein Hyatt Farber Schreck LLP, 410 17th Street, Suite 2200, Denver, Colorado 80202 on **October 27, 2017** at **9:00 a.m.** (prevailing Mountain Time), or such other place and time as the Debtor may determine, so long as such change is communicated reasonably in advance to all Qualified Overbidders and other invitees, if any.

(c)    The following procedures will govern the Auction:

(i)    all Qualified Overbidders shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and to have waived any right to jury trial in connection with any disputes relating to the Auction or the Sale of the Purchased Assets;

(ii)    all Qualified Overbidders (other than the Stalking Horse Bidder) shall be deemed to consent to provide the Debtor with admissible evidence in the form of affidavits or declarations establishing (A) the Qualified Overbidder's good faith, within the meaning of Section 363(m) of the Bankruptcy Code; and (B) that the Qualified Overbidder is capable and qualified, financially, legally, and otherwise, of unconditionally performing all obligations under the Competing Purchase Agreement;

(iii)    bidding will start at the amount of the highest bid submitted by a Qualified Overbidder, as determined by the Debtor;

(iv)    each subsequent bid shall be in increments of no less than $50,000 in cash;

(v)    if the Stalking Horse Bidder makes a Court-approved postpetition loan ("**DIP Loan**") to the Debtor, then the Stalking Horse  shall have the right to credit-bid any and all obligations outstanding under the DIP Loan.  If the Stalking Horse Bidder is not the Successful Bidder, then all sale proceeds received by the Debtor shall be used first to repay the DIP Loan,

6

if any, in full prior to making any other payments or distributions on account of any other claims or obligations;

(vi)    immediately before concluding the Auction, the Debtor shall: (a) review each Qualified Bid for its financial and contractual terms and the factors relevant to the Sale process and the best interests of the Debtor's estate, its creditors and other parties-in-interest therein; and (b) after consulting with its secured lender, Silicon Valley Bank, determine and identify the highest or otherwise best Qualified Bid (the "**Successful Bid**") and the Qualified Overbidder (or the Stalking Horse Bidder) submitting such bid (the "**Successful Bidder**");

(vii)    if, at the Auction's conclusion and consistent with the Bidding Procedures' terms, the Stalking Horse Bidder's final bid is greater than the highest bid made by any Qualified Overbidder, such final bid shall be the Successful Bid, the Stalking Horse Bidder shall be the Successful Bidder and the Bankruptcy Court shall approve the APA, including the Sale of the Purchased Assets (including the assignment of the Assumed Contracts, if any) to the Stalking Horse Bidder, and authorize the Debtor to sell the Purchased Assets (including the assignment of the Assumed Contracts, if any) to the Stalking Horse Bidder, and the amount of the Stalking Horse Bidder's final bid shall constitute the Purchase Price under the APA; and

(viii)    for the avoidance of doubt, the Debtor may elect to deem the Stalking Horse Bidder's final bid to be the Successful Bid, notwithstanding the receipt of an apparently higher bid from another Qualified Overbidder, if the Debtor reasonably concludes that the Qualified Overbidder may not be able to close on a timely basis.

5.    **Sale Hearing**

A hearing to consider approval of the Sale to the Successful Bidder (or to approve the APA if no Auction is held or the Successful Bid is by the Stalking Horse Bidder) will take place on **October 30, 2017** at [•] (prevailing Mountain Time) in the courtroom of the Honorable Joseph G. Rosania in the United States Bankruptcy Court for the District of Colorado, 721 19th St., Denver, Colorado 80202 (the "**Sale Hearing**").

15931239

6.      **Return of Overbidder's Deposit**

Except with respect to the Successful Bidder, all Overbidder's Deposits shall be returned within three business days after the Auction concludes, or, if no Auction is held, within three days after the Sale Hearing.

15931239