**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF COLORADO**

| | |
|---|---|
| In re: | |
| AJUBEO LLC,<br>EIN: 45-2467444, | Case No. 17-17924-JGR |
| | Chapter 11 |
| Debtor. | |

**CORRECTED MOTION FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (B) APPROVING STALKING HORSE BID PROTECTIONS, (C) APPROVING PROCEDURES FOR THE ASSUMPTION, ASSIGNMENT, AND SALE OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) APPROVING THE FORM AND MANNER OF NOTICE OF THE AUCTION AND SALE HEARING AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (E) SCHEDULING AN AUCTION AND SALE HEARING, AND (F) GRANTING RELATED RELIEF; AND (II)(A) AUTHORIZING AND APPROVING THE SALE OF SUBSTANTIALLY ALL ASSETS AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (B) WAIVING THE 14-DAY STAY OF FED. R. BANKR. P. 6004(h) AND 6006(d)**

Ajubeo LLC (the "**Debtor**"), the debtor and debtor in possession in the above-captioned case, hereby submits this motion (this "**Motion**")[1] pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"); Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); and Local Bankruptcy Rule 6004-1, seeking:

 (I) *First*, entry of an order, substantially in the form attached hereto (the "**Bidding Procedures Order**"):

  (A) approving the proposed bidding procedures described herein and annexed to the proposed Bidding Procedures Order (the "**Bidding Procedures**"),

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement attached as <u>Exhibit 1</u> hereto (the "APA").

1

15929114

for the proposed sale of substantially all of the Debtor's assets (as defined more specifically in the APA, the "**Purchased Assets**");

(B) approving the proposed breakup fee of three percent (3%) of the Purchase Price and expense reimbursement of up to $50,000 to be provided to the Stalking Horse Bidder (as defined below) pursuant to the APA (together, the breakup fee and expense reimbursement are referred to herein as the "**Bid Protections**");

(C) scheduling an auction (the "**Auction**") for the sale of the Purchased Assets (the "**Sale**") for October 27, 2017 and a hearing to consider approval of the Sale for October 30, 2017; and

(D) approving the form and manner of:

(i) the notice (the "**Notice of Sale**") that will be filed with this Court and served on all creditors and parties-in-interest regarding the Sale and the related hearing at which this Court will consider approval of the Sale (the "**Sale Hearing**"); and

(ii) the notice of potential assumption and assignment of certain executory contracts and unexpired leases (the "**Assignment Notice**");

(II) *Second*, following the Sale Hearing, entry of an order, a proposed form of which will be filed in advance of the Sale Hearing (the "**Sale Order**"), authorizing and approving:

(A) the Sale, free and clear of all liens, security interests, encumbrances, and interests thereon and thereagainst, except for those expressly assumed by

2

15929114

Green House Data, Inc. (the "**Stalking Horse Bidder**") or the Successful Bidder (defined below) (collectively, the "**Encumbrances**") to the Stalking Horse Bidder or the Successful Bidder in accordance with the terms of the purchase agreement executed by the Stalking Horse Bidder or Successful Bidder;

(B)    the assumption by the Debtor and assignment to the Successful Bidder of certain executory contracts and/or unexpired leases; and

(C)    a waiver of the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

In support of this Motion, the Debtor respectfully represents as follows:

## I.
## JURISDICTION

1.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. §157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for the relief sought herein are Bankruptcy Code sections 105(a), 363, and 365, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Rule 6004-1 of this Court's Local Bankruptcy Rules.

## II.
## BACKGROUND

A.    **General Background on Debtor's Business**

2.    On August 25, 2017 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor continues to be in possession of its property and in management of its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3

15929114

3.      The Debtor was founded in 2011 and is headquartered in Boulder, Colorado.  The Debtor is a provider of cloud infrastructure services, providing data storage, backup, disaster recovery, and virtual desktop capabilities.  It leases server equipment from four equipment lessors.[2]  The Debtor's customers are companies that rely on the Debtor for secure data storage with leading up-time and cloud speed at a lower cost of ownership.  The Debtor manages customer data that is critical to  customers' ongoing operations.

**B.      Pre- and Postpetition Marketing Efforts and Events Leading to Filing of Chapter 11 Case**

4.      In August 2016, the Debtor engaged the investment bank RCG, LLC (now Drake Star Partners, LLC, or "**Drake Star**") to market the business for sale.  At the time, the business was adding customers and improving its financial performance.  Based on the performance of the business and favorable M&A environment for infrastructure service businesses, the Board of Managers determined that it was in the best interests of creditors and equity holders to pursue a sale.

5.      Drake Star contacted and sent teasers to over 100 parties that Drake Star and the Debtor determined were potential candidates for a transaction.  Of those parties, 27 executed non-disclosure agreements (the "**Interested Parties**").  The Interested Parties were given the opportunity to gain access to confidential information related to the Debtor, and asked to submit non-binding indications of interest ("**IOIs**").  The Debtor received IOIs from seven Interested Parties, and six of the Interested Parties were invited to participate in management meetings, either in person or telephonically, with Drake Star and the Debtor's management team.  Remaining interested Parties were then asked to submit letters of intent ("**LOI**") to purchase the

---

[2] The Debtor believes that certain of the equipment "leases" are disguised financings, including the HP Financing Agreements (as defined and described below).  The Debtor reserves all rights as to the characterization of its equipment "leases."

15929114

Debtor or all of the assets of the Debtor.  Three written or verbal LOIs were received during the process.  On January 31, 2017, the Debtor signed an LOI with Stalking Horse Bidder for the sale of substantially all of the Debtor's assets.

6.     Prior to and after signing the January LOI, the Debtor suffered the loss or non-renewal of key customers, shortened renewal timeframes from a key customer, and diminished prospects for new customer additions.  This deterioration in business performance dampened Stalking Horse Bidder's interest in a transaction, and both parties terminated their LOI in March 2017.

7.     Between March and June 2017, the Debtor implemented cost-saving initiatives, reducing the employee base from 13 employees and consultants to 7 employees and consultants, in an effort to preserve liquidity, focus on serving its existing customer base, and secure customer renewals.

8.     In July 2017, the Debtor reestablished dialogue with Stalking Horse Bidder regarding a sale of the Debtor's assets, and signed a second LOI with Stalking Horse Bidder on August 10, 2017.

9.     While the Debtor was in the process of negotiating a definitive asset sale agreement with Stalking Horse Bidder, one of the equipment lessors filed a lawsuit seeking, *inter alia*, to seize the server equipment leased to the Debtor.  An "order to show cause" hearing was scheduled for August 25, 2017 at 10:00 a.m. MT.  The server equipment houses the Debtor's customers' data and is critical to the Debtor's operations.  In order to prevent the lessors from seizing the critical equipment and to preserve the going concern value of the business, the Debtor filed for chapter 11 protection on the Petition Date.

5

15929114

10.     Following the Petition Date, the Debtor and Stalking Horse Bidder resumed negotiations regarding a potential sale.  On September 5, 2017 the parties finalized the APA, pursuant to which the Debtor will sell the Purchased Assets to Stalking Horse Bidder, subject to the competitive bidding and auction process proposed herein.

11.     The APA with the Stalking Horse Bidder does not prohibit the Debtor from marketing its assets pending approval of this Motion.  Accordingly, the Debtor's Chief Restructuring Officer, Alliance Management, has been actively marketing the business since the date of Alliance's engagement.

## C.     The Debtor's Capital Structure

### *Assets*

12.     The Debtor's assets consist primarily of accounts receivable, cash, and intangible assets.  As of the Petition Date, the Debtor's accounts receivable totaled approximately $656,000 and its cash balance was approximately $6,500.  As of the date hereof, the Debtor's accounts receivable total approximately $885,000 and its cash balance is approximately $11,600.  The Debtor does not own any real property.

13.     The Debtor's assets also include certain server equipment purchased from Hewlett-Packard Financial Services Company ("**HP**") pursuant to three "Enterprise Business Lease Agreements" dated as of September 3, 2015, March 30, 2016, and June 23, 2016 (collectively with all schedules and exhibits to such Enterprise Business Lease Agreements, the "**HP Financing Agreements**").  The HP Financing Agreements are disguised security instruments rather than true leases, as, among other reasons, each includes a nominal $1 buyout option upon expiration of the "lease."  Accordingly, the equipment is property of the Debtor, subject to HP's security interest, if any.  HP failed to file a UCC financing statement naming the Debtor as debtor, and thus its security interest, if any, in the equipment is unperfected.

6

*Liabilities*

14.     As of the Petition Date, the Debtor's liabilities consisted primarily of (i) the secured claims of SVB and Integrity (each as defined below); (ii) arrearages on equipment leases; and (iii) unsecured trade debt.  Additionally, the Debtor will shortly seek Court approval of a DIP Loan (as defined below) in the amount of $298,000.   These liabilities are discussed below.

15.     Prepetition Secured Debt of SVB and Integrity.  Silicon Valley Bank ("**SVB**") holds a secured claim in the approximate amount of $630,000, secured by substantially all assets of the Debtor (excluding intellectual property) pursuant to that certain Loan and Security Agreement, dated as of May 12, 2014 (as amended), and perfected with a UCC Financing Statement filed on May 13, 2014.

16.     Integrity Capital Income Fund, Inc. ("**Integrity**"), also holds a secured claim against the Debtor.  Integrity holds a claim in the approximate amount of $915,000, secured by substantially all assets of the Debtor (excluding intellectual property) pursuant to that certain Loan and Security Agreement, dated as of November December 17, 2014 (as amended), and perfected with a UCC Financing Statement filed on December 17, 2014.

17.     Pursuant to a Subordination Agreement by and among SVB, Integrity, and the Debtor, Integrity has subordinated any security interest or lien that it may have in any property of the Debtor to the security interest or lien of SVB, notwithstanding the respective dates of attachment or perfection of SVB's and Integrity's respective security interests or liens.

18.     DIP Loan.  The Debtor will shortly file a motion seeking approval of a postpetition financing agreement between the Debtor, as borrower, and Stalking Horse Bidder, as

7

15929114

lender.   If such agreement is approved by the Court, Stalking Horse Bidder will provide postpetition financing in the amount of up to $298,000.

19.     Equipment Lease Debt.  The Debtor leases[3] servers from Farnam Street Financial, Inc. ("**Farnam**"), HP, Data Sales Co., Inc. ("**Data Sales**"), and CSC Leasing Company ("**CSC**"). As of the Petition Date, the approximate arrearages owed to Farnam, HP, Data Sales, and CSC under their respective equipment leases are $886,822.97, $122,942.05, $17,501.03, and $63,391.04, respectively.

20.     Unsecured Trade Debt.  As of the Petition Date, the Debtor owed approximately $415,000 to various vendors and other trade creditors.

*Equity*

21.     The Debtor's equity interests are owned by Infrastructures Investors, LLC and Tom Whitcomb, who own 2,000,000 Class A interests and 100,000 Class A interests, respectively.

## III.
## THE APA AND PROPOSED SALE PROCEDURES

22.     After extensive negotiations regarding the terms and conditions thereof, the Debtor and the Stalking Horse Bidder have agreed, in principle, to the key terms of the Sale, and have executed an Asset Purchase Agreement (the "**APA**," attached as Exhibit 1 hereto), which remains subject to this Court's approval.

**A.     Material Terms and Conditions of the APA[4]**

23.     The Debtor proposes to sell substantially all of the Debtor's assets to the Stalking Horse Bidder or to a competing bidder that submits a higher and better offer in accordance with

---

[3] As noted, the Debtor reserves all rights to dispute the characterization of any purported equipment "lease."

[4] The following summary is provided solely for the convenience of the Court and interested parties and is qualified in its entirety by reference to the provisions of the APA.  In the event of any inconsistency between the provisions of the APA and this summary, the terms of the APA shall control.

15929114

the Bidding Procedures.  Except for Encumbrances expressly assumed by the Successful Bidder, the Purchased Assets will be sold free and clear of all liens, claims, rights, interests, and encumbrances whatsoever, with all then-existing Encumbrances to attach to the net sale proceeds of the Purchased Assets with the same validity, enforceability, and priority, if any, as existed with respect to the Purchased Assets as of the Petition Date.

24.     The material terms of the proposed sale to the Stalking Horse Bidder or other Successful Bidder are as follows:

| Stalking Horse Bidder | The Stalking Horse Bidder is Green House Data, Inc., a Wyoming corporation.  Green House Data, Inc. is not an insider of the Debtor within the meaning of Bankruptcy Code section 101(31). |
|---|---|
| Purchase Price | The Purchase Price is $1,945,798, subject to adjustment based on the Closing AR Amount and the November Revenue Amount, as set forth in the APA. |
| Purchased Assets | Substantially all assets of the Debtor, excluding the Excluded Assets. |
| Excluded Assets | Among other Excluded Assets: (i) cash and cash equivalents; (ii) Debtor's minute books and stock books; (iii) any Avoidance Actions. |
| Assumed Liabilities | (i) All Liabilities for Cure Costs, (ii) the obligations of the Seller relating to the ownership or operation of the Purchased Assets accruing after the Cut Off Time, including any such Liabilities accruing for Taxes applicable to the Purchased Assets and all obligations under any of the Purchased Contracts arising after the Cut Off Time, (iii) all Taxes and Transfer Taxes, if any. |
| Excluded Liabilities | All liabilities and obligations not expressly assumed by the Stalking Horse Bidder. |
| Contracts to Be Assumed and Assigned | Subject to the assumption and assignment procedures proposed herein, the Debtor will assume and assign to the Stalking Horse Bidder the contracts listed on Schedule 1.2(a) to the APA, subject to Buyer's rights under the APA to exclude any Assumed Contract until the Closing Date. |

9

15929114

| | |
|---|---|
| **Closing** | If the 14-day stay of the Sale Order is waived, closing shall occur within three (3) business days after entry of the Sale Order, or at such other time and place as the parties may agree. Closing is subject to, among other conditions, entry of the Sale Order. |
| **Deposit** | None. |
| **Break-up Fee** | 3% of Purchase Price. |
| **Expense Reimbursement** | Stalking Horse Bidder shall be reimbursed for its reasonable Professional Fees, up to a cap of $50,000. |
| **Representations and Warranties** | Except as specifically set forth in the APA, the Stalking Horse Bidder will accept the Purchased Assets at Closing on an "As Is" and "Where Is" basis. |
| **Termination** | Buyer shall have the right to terminate the APA if the Closing does not occur by the Outside Date. Buyer's obligation to close the Sale is conditioned on, *inter alia*, the absence of any Material Adverse Change (as defined in the APA). |
| **Agreements with Management** | None. |

### B.     Proposed Bidding Procedures

25.     The proposed Bidding Procedures are annexed to the proposed Bidding Procedures Order attached hereto. They set forth the proposed procedures that prospective bidders must follow in order to bid on the Purchased Assets. The Bidding Procedures are intended to permit an expedited sale process to ensure that there is no disruption in the Debtor's operations pending closing of the sale, while simultaneously fostering an orderly and fair sale process. The Debtor has determined that the Bidding Procedures establish a framework that is

10

15929114

most likely to maximize the value of the Purchased Assets for the benefit of the Debtor's estate and its creditors.  Those procedures are summarized in relevant part below.[5]

**Participation Requirements**.

26.     To be qualified to receive any confidential information from the Debtor, a potential bidder must submit to the Debtor, prior to the receipt of any such information, an executed confidentiality agreement which shall inure to the benefit of the Successful Bidder, in a form and substance acceptable to the Debtor and the Stalking Horse Bidder.  To be qualified (i) to submit an Initial Overbid (as defined below), and (ii) to participate in the Auction, a potential bidder must submit to the Debtor before the Bid Deadline (as defined below) current audited financial statements and the latest unaudited financial statements of the potential bidder or, if such potential bidder is an entity formed for the purpose of acquiring the Purchased Assets, current audited financial statements and the latest unaudited financial statements of the equity holders or sponsors of such potential bidder who will guarantee the obligations of such potential bidder, or such other form of financial disclosure and/or credit-quality support or enhancement, if any, that will allow the Debtor to make a reasonable determination as to such potential bidder's financial and other capabilities to consummate the Sale.

27.     Based on the materials received by it, the Debtor shall determine whether any potential bidder that has timely submitted the materials referred to above qualifies to submit a bid (such qualifying potential bidder, an "**Overbidder**").

---

[5] The summary of the Bidding Procedures set forth herein is provided for the convenience of the Court and interested parties and is qualified in its entirety by the Bidding Procedures, which are attached hereto as an attached to the proposed Bid Procedures Order.  In the event of any inconsistency between the Bidding Procedures and this summary, the Bidding Procedures shall control. Capitalized terms used in this summary have the meaning ascribed to them in the Bidding Procedures.

15929114

## Bid Deadline.

28.     The deadline for submitting bids by an Overbidder shall be **October 23, 2017** at 5:00 p.m. (prevailing Mountain Time) (the "**Bid Deadline**").[6]

29.     Before the Bid Deadline, an Overbidder that desires to make a bid shall deliver written copies of its bid via overnight mail and email to (i) counsel for the Debtor, Brownstein Hyatt Farber Schreck LLP, 410 17th Street, Suite 2200, Denver CO 80202, Attn: Joshua M. Hantman; jhantman@bhfs.com; and (ii) counsel for Silicon Valley Bank, Riemer Braunstein, LLP, Three Center Plaza, Suite 600, Boston, MA 02108, Attn: Alexander Rheaume; arheaume@riemerlaw.com.

## Bid Requirements.

30.     To participate at the Auction, an Overbidder must submit the following to the Debtor before the Bid Deadline:

> (a)     a proposed asset purchase agreement (the "**Competing Purchase Agreement**") executed by the Overbidder that (i) is on substantially the same terms and conditions as the APA along with a redlined, marked copy showing all changes between the Competing Purchase Agreement and the APA (the Debtor's counsel will provide a copy of the APA in Microsoft Word format to Overbidders); (ii) provides for a purchase price to be paid to the Debtor that exceeds the Purchase Price[7] (as defined in the APA) by at least fifty thousand dollars ($50,000) cash (such aggregate amount of the Purchase Price plus $50,000, the "**Minimum Overbid**"); (iii) contains a list of the Debtor's executory contracts and unexpired leases with respect to which the Overbidder seeks assignment from the Debtor (whether set forth in the Stalking Horse Bidder's APA or a Competing Purchase Agreement, the "**Proposed Assumed Contracts**"); (iv) remains irrevocable until the earlier of the closing of a purchase of the Purchased Assets by the Successful Bidder and the Overbidder Outside Date (as defined below); (v) disclaims any right of the Overbidder to receive any transaction or breakup fee, expense reimbursement or similar fee or payment or to compensation under Bankruptcy Code Section 503(b) for making a substantial contribution; and (vi) contains a proposed closing date that is not later

---

[6] For the avoidance of doubt, all dates and deadlines set forth in this summary of the Bidding Procedures are subject to approval and/or modification by the Court.

[7] Pursuant to the terms of the APA, the Purchase Price is $1,945,798, subject to adjustment based on the Closing AR Amount and the November Revenue Amount, as set forth in the APA.

15929114

than November 15, 2017 or such later dates as may be agreed in writing by the Debtor and the Overbidder in their sole discretion (the "**Overbidder Outside Date**");

(b)      a cashier's check made payable to the order of the Debtor in the amount of $100,000 (the "**Overbidder's Deposit**"), which will be retained by the Debtor as a nonrefundable good faith deposit for application against the purchase price at the closing of the transaction or returned to the Overbidder or otherwise applied as set forth in these Bidding Procedures; and

(c)      admissible evidence in the form of affidavits or declarations establishing that the Overbidder has the financial ability to pay the purchase price and provide adequate assurance of future performance under all contracts to be assigned to it.

31.      A bid received from an Overbidder (and any bid submitted at the Auction by an Overbidder) that meets the requirements set forth above will be considered a "**Qualified Bid**" if, in the good faith opinion of the Debtor, after consulting with its financial and legal advisors and with SVB, (i) such bid is determined not to be materially more burdensome or conditional than the terms of the APA, and (ii) the Debtor reasonably believes that such bid would be consummated before the Overbidder Outside Date if selected as a Successful Bid (as defined below).  Each Overbidder will be notified within 24 hours of receipt of its bid by the Debtor whether such Overbidder's bid has been deemed a Qualified Bid.

32.      Each bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Purchased Assets prior to making any bids; that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Purchased Assets, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures or, as to the Successful Bidder, the asset purchase agreement with such Successful Bidder.

13

15929114

33.     The Stalking Horse Bidder, and any entity that submits a timely Qualified Bid accompanied by all items required to be submitted along therewith in accordance with these Bidding Procedures (an "**Initial Overbid**"), shall each be deemed a "**Qualified Overbidder**" and may bid for the Purchased Assets at the Auction.  Any entity (other than the Stalking Horse Bidder) that fails to submit a timely, conforming Initial Overbid, as set forth above, shall be disqualified from bidding for the Purchased Assets at the Auction.  The Debtor shall, promptly upon receipt of any Initial Overbid, provide copies of such Initial Overbid to the Stalking Horse Bidder and to Silicon Valley Bank.

<u>**The Auction**</u>.

34.     If no timely, conforming Initial Overbid is received, the Debtor shall not conduct an Auction and shall request at the Sale Hearing that the Court approve the APA, including the Sale of the Purchased Assets (including the assignment of the Assumed Contracts, if any) to the Stalking Horse Bidder, and request that the Sale Order shall be immediately effective upon entry, notwithstanding Bankruptcy Rule 6004(h).

35.     If one or more timely conforming Initial Overbids are received, the Debtor shall conduct an Auction of the Purchased Assets, in which the Stalking Horse Bidder and all other Qualified Overbidders may participate. The Auction shall be conducted at the offices of Brownstein Hyatt Farber Schreck LLP, 410 17th Street, Suite 2200, Denver, Colorado 80202 on October 27, 2017 at 9:00 a.m. (prevailing Mountain Time), or such other place and time as the Debtor may determine, so long as such change is communicated reasonably in advance to all Qualified Overbidders and other invitees, if any.

36.     The following procedures will govern the Auction:

14

15929114

(a)     all Qualified Overbidders shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and to have waived any right to jury trial in connection with any disputes relating to the Auction or the Sale of the Purchased Assets;

(b)     all Qualified Overbidders (other than the Stalking Horse Bidder) shall be deemed to consent to provide the Debtor with admissible evidence in the form of affidavits or declarations establishing (i) the Qualified Overbidder's good faith, within the meaning of Section 363(m) of the Bankruptcy Code; and (ii) that the Qualified Overbidder is capable and qualified, financially, legally, and otherwise, of unconditionally performing all obligations under the Competing Purchase Agreement;

(c)     bidding will start at the amount of the highest bid submitted by a Qualified Overbidder, as determined by the Debtor;

(d)     each subsequent bid shall be in increments of no less than $50,000 in cash;

(e)     if the Stalking Horse Bidder makes a Court-approved postpetition loan ("**DIP Loan**") to the Debtor, then the Stalking Horse  shall have the right to credit-bid any and all obligations outstanding under the DIP Loan.  If the Stalking Horse Bidder is not the Successful Bidder, then all sale proceeds received by the Debtor shall be used first to repay the DIP Loan, if any, in full prior to making any other payments or distributions on account of any other claims or obligations.

(f)     immediately before concluding the Auction, the Debtor shall: (a) review each Qualified Bid for its financial and contractual terms and the factors relevant to the Sale process and the best interests of the Debtor's estate, its creditors and

15

other parties-in-interest therein; and (b) after consulting with SVB, determine and identify the highest or otherwise best Qualified Bid (the "**Successful Bid**") and the Qualified Overbidder (or the Stalking Horse Bidder) submitting such bid (the "**Successful Bidder**");

(g)      if, at the Auction's conclusion and consistent with the Bidding Procedures' terms, the Stalking Horse Bidder's final bid is greater than the highest bid made by any Qualified Overbidder, such final bid shall be the Successful Bid, the Stalking Horse Bidder shall be the Successful Bidder and the Bankruptcy Court shall approve the APA, including the Sale of the Purchased Assets (including the assignment of the Assumed Contracts, if any) to the Stalking Horse Bidder, and authorize the Debtor to sell the Purchased Assets (including the assignment of the Assumed Contracts, if any) to the Stalking Horse Bidder, and the amount of the Stalking Horse Bidder's final bid shall constitute the Purchase Price under the APA; and

(h)      for the avoidance of doubt, the Debtor may elect to deem the Stalking Horse Bidder's final bid to be the Successful Bid, notwithstanding the receipt of an apparently higher bid from another Qualified Overbidder, if the Debtor reasonably concludes that the Qualified Overbidder may not be able to close on a timely basis.

37.    The Stalking Horse Bidder has standing and is deemed to be a party in interest with standing to be heard on any motion, hearing or other matter related to the APA or any bid or other sale of the Purchased Assets.

16

<u>**Sale Hearing**</u>.

38.     The Debtor requests a hearing to consider approval of the Sale to the Successful Bidder (or to approve the APA if no Auction is held or the Successful Bid is by the Stalking Horse Bidder) to take place on October 30, 2017 in the courtroom of the Honorable Joseph G. Rosania, Jr. in the United States Bankruptcy Court for the District of Colorado, 721 19th St., Denver, Colorado 80202 (the "**Sale Hearing**").

<u>**Return of Overbidder's Deposit**</u>.

39.     Except with respect to the Successful Bidder, all Overbidder's Deposits shall be returned within three business days after the Auction concludes, or, if no Auction is held, within three days after the Sale Hearing.

**C.     <u>Proposed Procedures for the Assumption and Assignment of Certain Executory Contracts</u>**[8]

40.     The Debtor seeks the authority to assume and assign the Assumed Contracts to the Stalking Horse Bidder (or, in the event that the Stalking Horse Bidder is not the Successful Bidder, such other contracts and leases as are designated in the Successful Bidder's bid).

41.     The Debtor shall, within two (2) business days after the entry of the Bidding Procedures Order, file and serve on each of the non-debtor counterparties (each a "**Counterparty**") to all executory contracts and unexpired leases of the Debtor (the "**Contracts**") a notice substantially in the form attached hereto as **Exhibit 3** (the "**Assignment Notice**") specifying the cure amounts necessary to assume each of the Contracts (the "**Cure Cost**") and the potential for the Debtor to assume and assign such agreements to the Successful Bidder.   The Assignment Notice may also identify any additional terms or conditions of

---

[8] If a party other than the Stalking Horse Bidder is the Successful Bidder or if a transaction other than the Sale is consummated for the sale of the Purchased Assets, then these procedures may be modified if necessary by further order of the Court.

17

assumption and assignment.  If the Debtor identifies additional executory contracts or unexpired leases that might be assumed by the Debtor and assigned to the Stalking Horse Bidder (or other Successful Bidder) not set forth in the original Assignment Notice, the Debtor shall promptly file and serve a supplemental notice (a "**Supplemental Assignment Notice**") to the applicable counterparties, and such additional contracts or leases shall be deemed Contracts for purposes of the Bidding Procedures Order.

42. Objections, if any, to the proposed Cure Costs, or to the proposed assumption and assignment of the Contracts, including, but not limited to, objections relating to adequate assurance of future performance by the Stalking Horse Bidder or objections relating to whether applicable law excuses the Counterparty from accepting performance by, or rendering performance to, the Successful Bidder for purposes of section 365(c)(1) of the Bankruptcy Code, must be in writing and filed with this Court and served on the Notice Parties (as defined hereinafter) so as to be received no later than five (5) business days prior to the Bid Deadline (the "**Designation and Cure Objection Deadline**"); *provided*, *however*, that in the event the Successful Bidder is a bidder other than the Stalking Horse Bidder (which, if applicable, will be set forth in the Notice of Successful Bidder and Assumed Contracts), objections relating to adequate assurance of future performance may be raised at any time prior to or during the Sale Hearing; *provided further*, *however*, that for any counterparty that receives a Supplemental Assignment Notice, the Designation and Cure Objection Deadline shall be the earlier of (i) ten (10) days after the mailing of the Supplemental Assignment Notice, or (ii) two (2) business days prior to the Sale Hearing.

43. Within twenty-four (24) hours after the conclusion of the Auction, the Debtor shall file a notice (the "**Notice of Successful Bidder and Assumed Contracts**"), which shall

18

15929114

state (i) the identity of the Successful Bidder, and (ii) the Contracts that the Debtor proposes to assume and assign to the Successful Bidder (the "**Assumed Contracts**").

44. Where a Counterparty files an objection meeting the requirements set forth herein, objecting to the assumption by the Debtor and assignment to the Successful Bidder of such Contract (the "**Disputed Designation**") and/or asserting a cure amount higher than the proposed Cure Costs listed on the Assignment Notice (the "**Disputed Cure Costs**"), the Debtor, the Stalking Horse Bidder, or the Successful Bidder (as the case may be), and the Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention. If the Debtor, the Counterparty, and the Stalking Horse Bidder (or the Successful Bidder, as the case may be), determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Disputed Designation and/or the amount to be paid under Bankruptcy Code section 365 with respect to the Disputed Cure Costs will be determined by this Court at the Sale Hearing. If this Court determines at the Sale Hearing that the applicable Assumed Contract will not be assumed and assigned, then such executory contract shall no longer be considered an Assumed Contract, *provided*, *however*, that after such determination is made by the Court, the Debtor may propose a new Cure Cost in accordance with the procedures set forth herein, including providing the applicable Counterparty with the Assignment Notice setting forth the redesignation and proposed new Cure Cost of the Assumed Contract.

45. Other than with respect to the ability to raise objections relating to adequate assurance of future performance of a Successful Bidder other than the Stalking Horse Bidder at any time prior to or during the Sale Hearing, any Counterparty to an Contract who fails to timely file an objection to the proposed Cure Costs or the proposed assumption and assignment of a

19

15929114

Contract by the Designation and Cure Objection Deadline is deemed to have consented to such Cure Costs and the assumption and assignment of such Contract, and such party shall be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts against the Debtor, its estate, or the Stalking Horse Bidder (or the Successful Bidder, as the case may be).

46.     If the Counterparty to a Contract fails to timely object to the assumption and assignment of a Contract or the proposed Cure Cost relating thereto by the Designation and Cure Objection Deadline, or upon the resolution of any timely objection by agreement of the parties or order of this Court approving an assumption and assignment, such Contract may be assumed by the Debtor and assigned to the Successful Bidder, and the proposed Cure Cost related to such Assumed Contract shall be established and approved in all respects, subject to the conditions set forth directly below.

47.     The Debtor's decision to assume and assign the Assumed Contracts is subject to Court approval and consummation of the sale.  Accordingly, subject to the satisfaction of conditions in connection with the sale, the Debtor shall be deemed to have assumed and assigned the Assumed Contracts as of the date of and effective only upon the Closing Date (as defined in the APA), and absent such closing, each of the Assumed Contracts shall neither be deemed assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtor under the Bankruptcy Code.  Also, inclusion of any document on the list of Contracts shall not constitute or be deemed to be a determination or admission by the Debtor or the Stalking Horse Bidder (or the Successful Bidder, as the case may be) that such document is, in fact, an executory contract within the meaning of the Bankruptcy Code, all rights with respect thereto being expressly reserved.  The Successful Bidder shall have no rights in and to a

20

15929114

particular Assumed Contract until such time as such agreement is assumed and assigned in accordance with the procedures set forth herein.

48.     Except as may otherwise be agreed to by the parties to an Assumed Contract, the defaults under the Assumed Contracts that must be cured in accordance with section 365(b) of the Bankruptcy Code shall be cured as follows: the Successful Bidder shall pay all Cure Costs relating to an assumed executory contract within ten days after the later of (i) the Closing Date, (ii) the date on which such Assumed Contract is deemed assumed and assigned or (iii) the date on which the Successful Bidder and contract counterparty otherwise agree to in writing.

49.     Following the Bid Deadline, no Proposed Assumed Contract may be excluded by the Stalking Horse Bidder or Successful Bidder, as applicable, and all Proposed Assumed Contracts shall be listed as Assumed Contracts in the Notice of Successful Bidder and Assumed Contracts.

50.     Any Contract that is not an Assumed Contract shall be deemed rejected as of the Closing Date; provided, however, that if any Contract to which the Counterparty is Data Sales Co., Inc., or Farnam Street Financial, Inc. is not an Assumed Contract, then such Contract shall be deemed rejected as of the date that is sixty (60) days after the Closing Date.

**D.     Notice Procedures**

51.     The Debtor shall, within two (2) business days of the entry of the Bidding Procedures Order, serve a copy of each of the Motion, the Bidding Procedures Order, and a copy of the Notice of Sale, substantially in the form annexed hereto as **Exhibit 2**, by first-class mail on the following parties (collectively, the "**Notice Parties**"): (i) all entities known to have expressed an interest in a financing or sale transaction with respect to the Debtor within two years prior to the date hereof, as evidenced by executing an NDA with the Debtor; (ii) any entities known to have asserted any Encumbrance in or upon the Purchased Assets; (iii) all

21

15929114

federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (iv) the Office of the United States Trustee; (v) the Internal Revenue Service; (vi) all entities that have requested notice in accordance with Bankruptcy Rule 2002; and (vii) all other known creditors of the Debtor.

52.     The Debtor shall serve an Assignment Notice on each Counterparty in the manner described above.

**IV.**
**LEGAL ARGUMENT**

**A.      The Sale of Substantially All of the Debtor's Assets Is A Sound Exercise of the Debtor's Business Judgment**

53.     Bankruptcy Code section 363 authorizes a debtor to sell assets of the estate other than in the ordinary course of business free and clear of liens, claims and encumbrances. *See* 11 U.S.C. § 363(b)(1) & (f); Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction.").  The decision to sell assets outside the ordinary course of business must be based upon a debtor's sound business judgment.  *In re Psychometric Sys., Inc.*, 367 B.R. 670, 675 (Bankr. D. Colo. 2007) (debtor's business judgment in a section 363 sale to be given "great deference"); *In re Castre, Inc.*, 312 B.R. 426, 428 (Bankr. D. Colo. 2004).  When dictated by the debtor's sound business judgment, a bankruptcy court can authorize the sale of all of the debtor's assets pursuant to Bankruptcy Code section 363(b)(1) prior to plan confirmation. *Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) ("[A] bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action.").

54.     Additionally, Bankruptcy Code section 105(a) provides a bankruptcy court with broad powers in the administration of a case so that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."

22

Further, pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code.").

55.     Here, it is the Debtor's business judgment that the sale is in the best interest of its creditors and the Debtor's estate, as it provides the Debtor with the best strategy for maximizing the value of its assets.  The Debtor lacks the cash flow, funding sources, and management necessary to support a reorganization.  A prompt Sale of the Purchased Assets is the Debtor's only viable opportunity to maximize value for creditors.

56.     Further, the proposed Bidding Procedures and the submission of a stalking horse bid assure that the highest and best price will be realized for the Purchased Assets.  A Notice of Sale will be provided to all persons the Debtor believes may have an interest in acquiring the Purchased Assets, which will maximize potential for overbids.

**B.     The Proposed Bidding Procedures Constitute an Appropriate Process to Obtain the Highest or Best Bid**

57.     The Debtor requests that the Court approves the Bidding Procedures.  As discussed above, the Debtor believes in its reasonable business judgment that the Bidding Procedures and the Sale, with Stalking Horse Bidder as the "stalking-horse" bidder, is the best strategy for maximizing the value of the Debtor's assets for the benefit of the various stakeholders. *See In re Psychometric Sys., Inc.*, 367 B.R. at 675. Moreover, the Bidding Procedures, and the use of a Minimum Overbid and Bidding Increments, will ensure a competitive and efficient bidding process which excludes disingenuous bidders while preserving the participation of the Stalking Horse Bidder.

15929114

58.     The proposed timeline set forth in the Bidding Procedures is reasonable in light of the circumstances.  The Debtor perceives a material risk that it will lose customer relationships if a sale is not promptly consummated.  Indeed, prepetition efforts to sell the business were not successful because of the loss of key customers.  Loss of customers would jeopardize the Debtor's ability to sell its business as a going concern, in which case conversion to chapter 7 would be the likely result.  In the event of a conversion, the likelihood of any distribution to unsecured creditors would be close to zero given that the liens of SVB and Integrity encumber substantially all of the Debtor's assets.

59.     Under the Debtor's proposed timeline, the Bid Deadline is October 23, 2017, and thus there will be a marketing period of nearly two months from the date hereof during which the Debtor will solicit bids and potential bidders can conduct due diligence.  The Debtor submits that this is more than sufficient time to market the Debtor's assets.  As noted above, the Debtor has already marketed the sale of the company's assets for approximately one year, with over 100 parties contacted.  Accordingly, many (if not most or all) potential buyers are familiar with the opportunity.  Moreover, the APA does not prohibit the Debtor from marketing its assets pending approval of this Motion.  Accordingly, the Debtor's Chief Restructuring Officer has been actively marketing the assets since the date of engagement.

60.     In sum, the proposed Sale Notice and proposed Bid Procedures are appropriate, reasonable, and designed to ensure the most robust bidding and auction process possible for the Purchased Assets.  In addition to providing appropriate notice, the Debtor, through its Chief Restructuring Officer, Alliance Management, will continue to contact various parties who have previously expressed an interest in acquiring assets of the Debtor to determine whether such parties are interested in submitting a bid.

24

15929114

C.      **The Bid Protections are Necessary and Appropriate**

61.     As a condition to the Sale Agreements, the Debtor is required to obtain approval of the Bid Protections in the Bid Procedures Order.  Breakup and other termination fees and expense reimbursements are a normal, and in some cases necessary, component of sales outside the ordinary course of business under section 363 of the Bankruptcy Code.  *See, e.g., In re Twenver, Inc.*, 149 B.R. 954, 956 (Bankr. D. Colo. 1992)*; In re Integrated Res., Inc.*, 147 B.R. 650, 660 (S.D.N.Y. 1992) (noting that breakup fees may be legitimately necessary to convince a single "white knight" to enter the bidding by providing some form of compensation for the risk it is undertaking); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 879 (Bankr. S.D.N.Y. 1990) (breakup fees in merger agreement approved); *In re 995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24, 28-9 (Bankr. S.D.N.Y. 1989) (payment of $500,000 breakup fee to outbid contract vendee following sale of debtor's property was not unreasonable absent evidence that fee chilled bidding).

62.     In considering whether to approve a breakup fee, courts generally consider the following three factors:  (i) the relationship between the initial bidder and the seller; (ii) whether the fee is designed to encourage bidding; and (iii) the size of the fee in relation to the purchase price.  *See In re Integrated Resources*, 147 B.R. at 657-63.  Here, each of the factors militates in favor of approving the breakup fee.

63.     *First*, the Stalking Horse Bidder is not an insider of the Debtor.  The APA, including the Bid Protections set forth therein, was negotiated extensively and at arms' length. The Stalking Horse Bidder was not in a position to and did not exert undue influence or pressure in negotiating the Bid Protections.

64.     *Second*, obtaining approval and authority to honor the Bid Protections is designed to facilitate the Debtor's efforts to assure a sale to a contractually committed bidder at a price the

25

15929114

Debtor believes is fair, while at the same time providing the Debtor with the potential of even greater benefit to the estate through a competitive bidding process.

65.     *Third*, a breakup fee that constitutes a fair and reasonable percentage of the proposed purchase price and that is reasonably related to the risk, effort, and expenses of the prospective purchaser is generally permissible.  *See, e.g., In re 995 Fifth Ave. Assoc.*, 96 B.R. 25, 28 (Bankr. S.D.NY. 1989); *In re Integrated Resources, Inc.*, 147 B.R. at 662 (breakup fee was a reasonable percentage of proposed purchase price and in accord with industry averages).

66.     Here, the breakup fee is 3% of the purchase price.  This percentage is well within the order of magnitude of breakup fees approved in other cases.  *See, e.g.*, *In re Coupounas,* Case No. 14-23906-EEB (Bankr. D. Colo. Oct. 31, 2014) (approving breakup fee equal to roughly 3% of transaction price); *Twenver*, 149 B.R. at 957; *Consumer News & Bus. Channel P'ship v. Fin. News Network, Inc. (In re Fin. News Network, Inc.)*, 980 F.2d 165, 167 (2d Cir.1992) (noting without discussion $8.2 million breakup fee on $149.3 million transaction (5.5% of consideration offered)); *see also LTV Aerospace & Defense Co. v. Thomson-CSF, S.A. (In re Chateugay Corp.)*, 1998 B.R. 848, 861 (S.D.N.Y. 1996) (enforcing $20 million "reverse breakup fee" payable to debtor on $450 million offer (4.4% of consideration)).

67.     The Bid Protections are beneficial to the Debtor's estate and its creditors, as the APA establishes a floor for further bidding on the Purchased Assets.  Moreover, the Stalking Horse Bidder is unwilling to commit to holding open its offer to purchase the Purchased Assets unless the Bid Procedures Order includes approval of the Bid Protections.  Thus, absent entry of the Bid Procedures Order and approval of the Bid Protections, the Debtor may lose the opportunity to obtain the highest and best offer it has received to date.  Accordingly, the Bid Protections should be approved.

26

15929114

**D.**  **The Sale Must Be Free and Clear of All Liens, Claims, Encumbrances and Other Interests Pursuant to 11 U.S.C. § 363(f)**

68.     To facilitate the sale of the Purchased Assets, the Debtor also requests authorization to sell the Purchased Assets free and clear of any and all liens, encumbrances, and other interests, other than as provided in this Motion and in the APA.

69.     Section 363(f) of the Bankruptcy Code permits debtors to sell assets free and clear of liens, claims, and encumbrances with interests in the property attaching to the net proceeds of the sale.  Section 363(f) provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

70.     Here, the only parties known to assert a lien in the Purchased Assets are the following:

71.     SVB and Integrity assert first and second priority liens, respectively, in substantially all assets of the Debtor.  SVB and Integrity consent to the Sale free and clear of their liens.  The proposed Sale Order will provide for the payment in full of SVB's secured claim upon closing of the Sale, provided, however, that such payment shall be subject to clawback in the event that any party in interest successfully asserts a timely challenge to SVB's claim or its lien pursuant to the cash collateral order.

27

15929114

72.     HP may assert a security interest in the server equipment described above, but its security interest, if any, was not perfected by the filing of a UCC financing statement and is thus subject to bona fide dispute. *See* 11 U.S.C. § 363(f)(4).

73.     VAR Resources, Inc. ("**VAR**"), BMO Harris Bank National Association ("**BMO Harris**"), and Optum Bank, Inc. ("**Optum**") may assert security interests in certain of the Debtor's equipment (the "**VAR Equipment**").  The Debtor leased the VAR Equipment from VAR pursuant to that certain Master Lease Agreement dated as of January 19, 2012 and three Equipment Lease Schedules thereto (collectively, the "**VAR Agreements**").  Schedule No. 002 to the Master Lease Agreement (as amended) contained a $1 buyout option upon expiration of the lease on April 1, 2016.  Accordingly, the Debtor owns the equipment described in Schedule 002 free and clear of any lien or interest of VAR or its successors or assigns.  The equipment described in Schedules 001 and 003 to the Master Lease Agreement was subject to a "FMV" buyout option upon expiration of the lease in 2015.  Based on UCC filings filed with the Colorado Secretary of State, it appears that VAR assigned its interest in Lease Schedule Nos. 001 and 003 to BMO Harris, and assigned its interest in Lease Schedule No. 002 to Optum.  The Debtor believes that since all of the obligations under the VAR Agreements have been paid in full, the VAR Equipment is property of the Debtor and is not subject to any lease, lien, claim, or interest.  Nevertheless, the APA provides for a $10,000 interest in the Purchase Price in the event that the Debtor is unable to sell such equipment free and clear of all leases, liens, claims, or interests.  VAR, BMO, and Optum will all receive notice of this Motion, as set forth in the Certificate of Service attached hereto.

74.     In addition, Virginia Commonwealth Bank ("**VCB**") may assert a security interest in assets of the Debtor.  On July 23, 2013, VCB filed a UCC financing statement with the

28

15929114

Colorado Secretary of State naming the Debtor as the debtor and VCB as the secured party. However, the UCC filing contained no description of the alleged collateral and thus is invalid to perfect VCB's secured claim, if any. Accordingly, the extent VCB asserts a security interest, it is subject to bona fide dispute and the Debtor's assets may be sold free and clear of such alleged lien. *See* 11 U.S.C. § 363(f)(4).

**E.**     **Stalking Horse Bidder or the Successful Bidder Should be Afforded the Protections of 11 U.S.C. § 363(m) for a Good Faith Purchaser**

75.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to any entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

76.     The Debtor requests that the Court find that the Stalking Horse Bidder or Successful Bidder is a good faith purchaser within the meaning of Bankruptcy section 363(m), subject to the provision of further representations or evidence at the Sale Hearing. The APA is a product of extensive negotiations between the Debtor and the Stalking Horse Bidder, and does not contain special treatment for the Debtor, the Debtor's estate, the Stalking Horse Bidder, or their respective affiliates or insiders. The terms of the APA are fair and reasonable, particularly in view of the Stalking Horse Bidder's extensive efforts to date, the risk to the Stalking Horse Bidder of serving as a "stalking horse" bidder, and the stabilizing effect that the execution of the APA is expected to have (thereby preserving value for creditors and increasing the likelihood of additional bidding).

77.     Moreover, the Debtor submits that any asset purchase agreement reached as a result of the Bidding Procedures will be an arm's length, negotiated transaction entitled to the protections of section 363(m). Further, by the Sale Hearing, the Debtor will have fully disclosed

15929114

and requested this Court's approval of all of the terms and conditions of the proposed sale and bidding procedures and provided notice as required by the Bankruptcy Rules, the Local Bankruptcy Rules, and as otherwise directed by the Court. *See In re Colony Hills Assocs.*, 111 F.3d 269, 276–77 (2d Cir. 1997) ("Although full disclosure to the bankruptcy court may not always neutralize conduct that would otherwise constitute bad faith, disclosure should certainly weigh heavily in a bankruptcy court's decision on that issue."). Based on the foregoing, the Stalking Horse Bidder or the Successful Bidder, as the case may be, should be deemed a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code.

## F.   Adequate and Reasonable Notice Has Been Provided

78.   Section 363 of the Bankruptcy Code requires that interested parties receive adequate notice of the sale. Full disclosure of the terms of the sale will be provided pursuant to the Notice of Sale as described above. Such notice is reasonably calculated to provide timely and adequate notice to the Debtor's major creditor constituencies, those parties most interested in this case, and those parties potentially interested in bidding on the Purchased Assets.

79.   The Debtor also submits that the notice to be provided via the Assignment Notice is reasonably calculated to provide all Counterparties with proper notice of the potential assumption and assignment of their executory contracts, any Cure Costs relating thereto, and procedures relating thereto, including, but not limited to, the Designation and Cure Objection Deadline. As such, the proposed Assignment Notice is appropriate and sufficient under the circumstances.

## G.   The Court Should Authorize the Assumption and Assignment of Executory Contracts and Unexpired Leases

80.   The Debtor seeks authorization under Bankruptcy Code section 365 to assume and assign the Assumed Contracts to the Stalking Horse Bidder or Successful Bidder, as the case

30

15929114

may be.  The Debtor further requests that the Sale Order provide that the Assumed Contracts will be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder, notwithstanding any provisions in the Assumed Contracts.

81.     Bankruptcy Code section 365 authorizes the Debtor to assume and assign its executory contracts and unexpired leases subject to the approval of the Bankruptcy Court.  The standard governing motions to assume or reject unexpired leases and executory contracts is the business judgment test, which requires a showing that the proposed course of action will benefit the estate.  *In re Mile High Medal Sys., Inc.*, 899 F.2d 887, 896 n.13 (10th Cir. 1990); *In re Grayhall Resources, Inc.*, 63 B.R. 382, 384 (Bankr. D. Colo. 1986).

82.     If necessary at the Sale Hearing, the Debtor will proffer evidence or testimony that it has determined that assumption and assignment of the Assumed Contracts to the Successful Bidder in connection with the Sale represents an exercise of its sound business judgment.  Moreover, the Debtor expects to be able to satisfy the requirements of Bankruptcy Code sections 365(b) and (f) because: (i) undisputed monetary cure obligations for any contracts that are assumed and assigned will be paid, *see* 11 U.S.C. § 365(b)(1)(A) and (B); and (ii) to the extent that a non-debtor party to an Assumed Contract does not consent to an assignment of such Assumed Contract, the Debtor will be prepared to demonstrate at the sale hearing the requirement of adequate assurances of future performance by the Successful Bidder is satisfied. *See* 11 U.S.C. § 365(b)(1)(C), (b)(3), and (f)(2); *see also Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D. N.J. 1989).

83.     The Sale Hearing will, therefore, provide the Court and other interested parties with further opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance under the Assumed Contracts, as required by Bankruptcy Code

31

15929114

section 365(b)(1)(C).  Accordingly, this Court should authorize the Debtor to assume and assign the Assumed Contracts to the Successful Bidder according to the proposed procedures described above.

**H.      This Court Should Waive the Fourteen-Day Stay Period Imposed by Bankruptcy Rules 6004(h) and 6006(d)**

84.      The Debtor requests a waiver of any stay of the effectiveness of the orders approving the relief requested in this Motion.   Bankruptcy Rules 6004(h) and 6006(d) each provide for a stay of an order authorizing sale under Bankruptcy Code section 363 and assignment of an unexpired lease or executory contract for 14 days. As noted above, the Sale must be effectuated expeditiously to ensure that the Debtor does not face a loss of customers and/or a liquidity crisis, which could irreparably harm the estate.  Thus, cause exists for a waiver of the 14-day stay.

85.      The Debtor has noticed the hearing on this Motion to all of its creditors and other parties-in-interest, and therefore any person having any objection to the Motion has been afforded a reasonable opportunity to voice any objections or concerns.  Accordingly, the Debtor is aware of no prejudice that would be caused by the Court's waiver of the 14-day stay.

*[Remainder of page intentionally left blank]*

15929114

**WHEREFORE**, the Debtor requests that the Court enter orders granting the relief requested in this Motion and such other relief as is just and proper.

Dated this 5th day of September, 2017.

Respectfully submitted,

**BROWNSTEIN HYATT FARBER SCHRECK, LLP**

By:  *s/ Joshua M. Hantman*
Michael J. Pankow, #21212
Joshua M. Hantman, #42010
Samuel M. Kidder, #49125
410 17th Street, Suite 2200
Denver, Colorado 80202
Telephone: (303) 223-1100
Facsimile: (303) 223-1111
mpankow@bhfs.com
jhantman@bhfs.com
skidder@bhfs.com

*Attorneys for Debtor*

15929114

34

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of September, 2017, a true and correct copy of the foregoing motion was electronically filed with the Court using the CM/ECF system, which sent notification to all parties in interest participating the CM/ECF system, was served by placing same via first class mail postage prepaid properly addressed to (i) all parties identified on the attached mailing matrix, and (ii) the following parties:

Drake Star Partners
950 Third Avenue
New York, NY  10022


_____*s/ Sheila M. Grisham*_____
Sheila M. Grisham

15929114